FRED W. WENZEL AND MARY WENZEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wenzel v. Commissioner
Docket No. 29466-88
United States Tax Court
T.C. Memo 1991-166; 1991 Tax Ct. Memo LEXIS 185; 61 T.C.M. (CCH) 2396; T.C.M. (RIA) 91166; April 10, 1991, Filed *185 Decision will be entered for the respondent. In 1979 petitioners purchased a farm with an acreage allotment for the production of peanuts. Petitioners depreciated the allotment as an intangible asset for the taxable years 1982 through 1985. Held: Petitioners' allotment was not subject to depreciation. Held further: Petitioners are liable for the addition to tax for substantial understatement of income tax for the taxable year 1985. James D. Spratt, Jr., for the petitioner. John W. Sheffield, III, for the respondent. WHITAKER, Judge
WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency and an addition to tax in petitioners' Federal income tax as follows: Addition to Tax
Year
Deficiency
Section 6661 [1]
1985
$ 42,123
$ 10,531
The issues for decision are: (1) Whether petitioners' acreage allotment for the production of peanuts was subject to depreciation as an intangible asset pursuant to section 167. We hold that petitioners' allotment was not subject to depreciation. (2) Whether petitioners are liable for the addition to tax for substantial understatement of income tax for the taxable year 1985 pursuant to section *186 6661. We hold that petitioners are liable for the addition to tax for the taxable year 1985.
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Petitioners, Fred W. Wenzel and Mary Wenzel, husband and wife, resided in Chesterville, Missouri, at the time their petition was filed. Petitioners filed a joint Federal income tax return for the taxable year 1985. In 1979 petitioners purchased approximately 3,000 acres of land known as Kolomoki Plantation which is located in Clay and Early Counties, Georgia. The total purchase price was $ 1,997,897. Included in the 3,000 acres was an acreage allotment for the production of peanuts (petitioners' allotment), totaling 302.8 acres. Of the purchase price, $ 302,800 was allocated to petitioners' allotment. For purposes of this case, respondent conceded that petitioners paid fair market value for the land. For purposes of this case, the parties stipulated that the value allocated by petitioners to petitioners' allotment in 1979 was a reasonable allocation. Subsequent to the purchase of the property, petitioners' used the property *187 in petitioners' business of the production of row crops, including peanuts. Petitioners' allotment constitutes an intangible asset that is used in petitioners' trade or business of peanut farming and production. The parties also stipulated that petitioners' allotment is significant, useful, and valuable asset in petitioners' peanut-farming business. The Agricultural Adjustment Act of 1938, ch. 30, tit. III, sec. 301 et seq., 52 Stat. 31, 38, 7 U.S.C. sec. 1281 et seq. (1988) (the 1938 Act), provided for farm acreage allotments to grow certain commodities, such as tobacco and wheat. In 1941, the 1938 Act was amended to provide for farm acreage allotments for peanut production (allotment). The Agricultural Adjustment Act of 1938, as amended, ch. 39, tit. III, secs. 357-359, 55 Stat. 88, 7 U.S.C. secs. 1357-1379 (the 1938 Act, as amended). Congress initiated this system of acreage allotments in an effort to control the production and domestic and export marketing of peanuts. Prior to this Act, an oversupply of peanuts in the market had the effect of depressing market prices. Neither the 1938 Act nor the 1938 Act, as amended, contain any provisions limiting the duration of the *188 Acts. Therefore, unless the 1938 Act, as amended, is amended or repealed by amendment, the peanut program provided for in the 1938 Act, as amended, would remain unaffected. Every 4 years, new farm bills are introduced into Congress. Many of these bill propose changes to various farm programs for the upcoming 4-year crops. Generally, the bills once enacted as amendments to the 1938 Act, as amended, contain provisions limiting the duration of the amendment to the upcoming 4-year crops. The 1938 Act, as amended, provided for a national marketing quota for peanuts. The national marketing quota was determined by taking the average of the total quantity of peanuts harvested for nuts during the 5 years immediately preceding the year in which the quota was proclaimed. This average was then adjusted by the Secretary of Agriculture based upon his prediction of what the current trends in production and prospective demand conditions would be. The national marketing quota for peanuts was converted to a national acreage allotment by dividing the quota by the normal yield per acre of peanuts for the United States. The normal yield per acre for the United States was determined by the Secretary *189 of Agriculture on the basis of the average yield per acre of peanuts in the 5 years preceding the year in which the quota was proclaimed, adjusted for trends in yields and for abnormal conditions of production affecting yields in those 5 years. The national marketing quota for the 1941 crop year could not be less than the quantity of peanuts sufficient to provide a national acreage allotment of not less than 1,610,000 acres. In subsequent years, the national marketing quota was required to be a quantity of peanuts sufficient to provide a national acreage allotment of not less than 95 percent of that established for the 1941 crop. The national acreage allotment was apportioned among states on the basis of the average acreage of peanuts harvested for nuts in the 5 years preceding the year in which the national acreage allotment was determined, adjusted for trends in yields and abnormal conditions of production. Each state acreage allotment was apportioned among farms in that state. The farms which received allotments were farms on which peanuts were grown in any of the 3 years immediately preceding the year for which the allotment was determined. Such apportionment was made on *190 the basis of the tillable acreage available for the production of peanuts and the past acreage of peanuts on the farm. The actual amount of peanuts produced on the allotment equaled the marketing quota for the farm. The original recipients of allotments were the farmers producing peanuts on their own land in 1938. Allotments provided their owners the exclusive right or license to produce peanuts. The 1938 Act, as amended, did not contain any provisions defining a term of years that a farmer would be entitled to his allotment. Only an amendment terminating the provisions providing for allotments in the 1938 Act, as amended, would cause the farmer to lose his allotment. A farmer could sell his allotment or sell his land with the allotment, and a farmer could lease his allotment. A farmer with an allotment was subject to financial penalties if he marketed peanuts in excess of the marketing quota. Any farmer who grew peanuts without an allotment was subject to financial penalties. However, any farmer was entitled to produce peanuts on one acre or less without incurring financial penalties. The Agricultural Act of 1949, ch. 792, tit. I, sec. 101, 63 Stat. 1051, 7 U.S.C. sec. *191 1421 (the 1949 Act), was enacted to stabilize prices of agricultural commodities. The 1949 Act established a price support program in which the Secretary of Agriculture was directed to make loans available to farmers with marketing quotas for peanuts. The Secretary provided the price support programs through the Commodity Credit Corporation (CCC). The CCC offered loans to farmers at a specified loan rate and the harvested peanut crop served as collateral. These loans provided farmers with operating capital. If the farmer was unable to sell his crop at a profitable rate and repay the loan with interest before it matured, the CCC accepted the collateral as full repayment of the loan. During the 1960's and early 1970's, peanut production was greater than domestic demand. This resulted in an over supply of peanuts. This situation developed despite the existence of the allotment system. Many farmers forfeited their peanut crop to the CCC. This led to a large buildup of Government-owned peanut stocks. Peanuts cannot be stored for any period longer than 8 to 12 months. Much of the Government-owned stock had to be crushed into peanut butter, oil, and meal. As a result, the CCC *192 incurred large losses. In 1977 Congress was concerned about the oversupply of peanuts and the increased costs to Government. As a result of these concerns, the peanut program was revised in the Food and Agriculture Act of 1977, Pub. L. 95-113, secs. 801-807, 91 Stat. 913, 944 (the 1977 Act). Sections 801 through 807 of the 1977 Act amended the 1938 Act, as amended. Section 801 of the 1977 Act provided that sections 358(a) and (e) of the 1938 Act, as amended, would not be applicable to the 1978 through 1981 crop years for peanuts. Section 358(a) of the 1938 Act, as amended, provided for a national marketing quota. Section 358(e) of the 1938 Act, as amended, provided for county acreage allotments. Section 802 of the 1977 Act added new subsections (k) through (p) to section 358. These revisions are explained below. Effective for the 1978 through 1981 peanut crops, a national acreage allotment for peanuts was established, taking into consideration projected domestic use, exports, and a reasonable carryover. Carryover is the quantity of peanuts on hand in the United States at the beginning of a marketing year, but carryover does not include any quantity which was produced in *193 the United States during the then current calendar year. The national acreage allotment could not be less than 1,614,000 acres. A minimum national poundage quota for peanuts was established. The minimum national poundage quota was 1,680,000 tons for 1978; 1,596,000 tons for 1979; 1,516,000 tons for 1980; and 1,440,000 tons for 1981. The minimum national poundage quota could be adjusted to meet the total estimated requirements for domestic edible use and a reasonable carryover. Domestic edible use meant use for milling to produce domestic food peanuts, seed, and use on a farm. A farm yield for peanuts was established for each farm which possessed an allotment. Farm yield equaled the average of the actual yield per acre on the farm for each of the 3 crop years in which yields were highest on the farm out of the 5 crop years 1973 through 1977. For each farm, a farm base production poundage was established. The farm base production poundage was determined by multiplying the allotment by the farm yield. For each farm, a farm poundage quota was established. A farm poundage quota was determined by multiplying the farm base production poundage by a factor determined by the Secretary *194 of Agriculture. The total of all farm poundage quotas equaled the national poundage quota. The price support program was also amended to provide different support levels for quota and additional peanuts. Quota peanuts were any peanuts which were eligible for domestic edible use and which did not exceed the farm poundage quota of the farm. Additional peanuts were any peanuts which were in excess of the marketings of quota peanuts for a farm but not in excess of the actual production of the allotment. For quota peanuts, the level of support could not be less than $ 420 per ton. The level of support for additional peanuts was determined by taking into consideration the demand for peanut oil and peanut meal, expected prices of other vegetable oils and protein meals, and demand for peanuts in foreign markets. The modified peanut program was successful in reducing Government costs. Federal net outlays (amount of loans made to peanut producers less loan repayments) for the fiscal years 1978 through 1981 averaged approximately $ 11 million per year in contrast to an average of approximately $ 84 million per year in the preceding 4 years. Net realized losses (nonrecoverable outlays *195 of peanut price support operations) for the fiscal years 1978 through 1981 averaged $ 45 million per year in contrast to $ 71 million per year for the preceding 3 years. Peanut production tripled from 1957 to 1979. This increase in production was the result of increased yield per acre. The increased yield was the result of new seed varieties, new technology, increased inputs such as fertilizer, and better management. In 1979 peanut production averaged close to 4 billion pounds and was valued at $ 819 million. In 1981 peanut production was also 4 billion pounds. During this period, the peanut industry and the policymakers of the United States vigorously pursued the United States' share of the edible peanut market. Although the United States produced only 10 percent of the peanuts produced worldwide, the United States' share of world trade was almost 50 percent. Prior to 1970, United States peanut exports accounted for less than 5 percent of the world trade. In the 1970's, exports accounted for 15 percent, and in the early 1980's, exports accounted for 25 percent. During this period, the United States was one of the world's leading exporters of peanuts, third only to India *196 and China. In 1981 the peanut program became the subject of intense debate in Congress. Some of the strong supporters of the peanut program in Congress were not reelected. Numerous bills to amend or modify the peanut program were introduced in Congress. The arguments made for deregulating the peanut program were that anyone should be allowed to grow peanuts, not just those farmers who received allotments as their inheritance or paid rents to allotment owners. Supporters of the peanut program argued that the program provided price stability and supply dependability. They also argued that any move to change the program would hurt family farmers and rural economies. Many congressional representatives from peanut-producing states rejected any proposal to suspend allotments. The Administration proposed suspending the allotment system to create a more market-oriented peanut program. The Administration's objectives for farm programs for the next 4 years were to reduce the role of Government in agriculture, to maintain and increase agricultural productivity to meet export demands, and to minimize program costs to the Government. The Administration's proposal would have permitted *197 allotment owners to retain their share of the poundage quota. The Agriculture Committees of both the House and the Senate proposed to continue the production controls and marketing restrictions in the peanut program and to increase the price support level significantly for peanuts marketed for domestic use. The Administration later reversed its position and supported the proposal of the House Agriculture Committee for the peanut program. Both the House and Senate amended the peanut program reported out of their Agriculture Committees and passed programs which provided for the suspension of allotments. House and Senate farm bill conferees also proposed to suspend the allotment program. However, under the bill adopted by the House and Senate conferees, all allotment owners would benefit from possession of a share of the national poundage quota and the level of price support would increase from $ 455 per ton to $ 580 per ton. Peanut growers voiced their concerns about the debate in Congress. A news release by the Georgia Agricultural Commodity Commission for Peanuts (GACCP) dated October 16, 1981, indicated that the Commission was concerned about the amendments to the peanut program *198 offered in the House. In that release, George Whelchel, chairman of the Commission, was reported to have said that there was still hope that the peanut program would be continued. A letter written by a representative of the GACCP also expressed concern to the members about various proposals to terminate the allotment program, but also expressed hope that the peanut program would not be terminated. Congress suspended the provisions allowing for allotments in the Agriculture and Food Act of 1981, Pub. L. 97-98, secs. 701-707, 95 Stat. 1213, 1248, 7 U.S.C. sec. 1445c-1 (the 1981 Act). The 1981 Act provided that effective for the 1982 through 1985 peanut crops, the national poundage quota for peanuts would be 1,200,000 tons for 1982; 1,167,300 tons for 1983; 1,134,700 tons for 1984; and 1,100,000 tons for 1985. The national poundage quota was apportioned among the States. A farm poundage quota was established for each farm which had an allotment for the 1981 crop year. The farm poundage quota for any farm for the 1982 through 1985 crop years was equal to the farm poundage quota for that farm for the preceding year. A farm yield was determined for each farm for which a farm poundage *199 quota was established for the 1981 crop. The farm yield was equal to the average of the actual yield per acre on the farm for each of the 3 crop years in which yields were highest on the farm out of the 5 crop years 1973 through 1977. A price support program was still available for quota and additional peanuts for the 1982 through 1985 crops. The quota support price was established at an amount no less than $ 550 per ton, up from $ 455 in 1981. This increase reflected the increase in cost of production. The level of support for additional peanuts was determined after taking into consideration the demand for peanut oil and peanut meal, expected prices of other vegetable oils and protein meals, and the demand for peanuts in foreign markets. The minimum CCC export resale price for additional peanuts was $ 425 per ton for 1985. The definition of quota peanuts remained unchanged from the 1977 Act. However, the definition of additional peanuts was enlarged. The 1981 Act, as in the 1977 Act, provided that additional peanuts were any peanuts that were marketed from a farm for which a farm poundage quota was established and that were in excess of the marketings of quota peanuts from *200 the farm. The 1981 Act also provided that additional peanuts included all peanuts marketed from a farm for which no farm poundage quota was established. Basically, farmers who had prior allotments were still allowed to produce peanuts based on their farm poundage quota. The farmer's farm yield and allotment were factors used in determining his farm poundage quota. These farmers also continued to receive price supports for both their quota and additional peanuts. These farmers were also the only farmers who could produce quota peanuts. Other farmers could now produce additional peanuts. The Food Security Act of 1985, Pub. L. 99-198, secs. 701-707, 99 Stat. 1354, 1430, 7 U.S.C. sec. 1445c-2 (the 1985 Act), basically contained the same provisions as in the 1981 Act, except that the national poundage quota could not be less than 1,100,000 tons. During the taxable years 1979, 1980, and 1981, petitioners did not claim any depreciation deductions for their allotment. Petitioners did not depreciate their allotment in those years because petitioners did not believe that their allotment had a determinable useful life. In 1981, Larry H. Evans, an accountant for petitioners, advised *201 them that they should claim depreciation deductions for their allotment over the next 4 years, 1982 through 1985. Mr. Evans believed that their allotment would be terminated after the 1985 crop year. This advice was based on the fact that the peanut program was a controversial topic in Congress and that allotment programs for other commodities, except tobacco and peanuts, were terminated. In 1982 petitioners began depreciating their allotment, claiming a basis of $ 302,800 in their allotment and depreciating their allotment over a 4-year period. Using the straight-line method of depreciation, petitioners claimed depreciation deductions of $ 75,700 per year for the taxable years 1982 through 1984. The 4-year useful life was based on the 4-year life of the peanut provision of the 1981 Act. With the continued suspension of allotments under the 1985 Act, petitioners redetermined the useful life of their allotment and claimed a depreciation deduction for the taxable year 1985 in the amount of $ 12,617, which was based on a 5-year useful life of the asset. In the notice of deficiency for the taxable year 1985, respondent disallowed a depreciation deduction in the amount of $ 12,617 *202 because he determined that farm acreage allotments for the production of peanuts are intangible assets which have an indeterminate useful life and, therefore, are not subject to depreciation. In the alternative, respondent explained that if petitioners' allotment was held to be subject to depreciation, respondent determined that the basis for depreciation for 1983 and 1984 was $ 45,420 and the useful life was 3 years, and the basis for 1985 was $ 15,140 and the useful life was 6 years. In determining the deficiency for the taxable year 1985, respondent redetermined petitioners' net operating losses for 1982, 1983, and 1984, by disallowing the depreciation of petitioners' allotment in the amount of $ 75,700 claimed by petitioners in each of those years, for the purpose of determining what net operating loss should be carried over to 1985. As a result of these adjustments, petitioners' allowable net operating loss deduction for 1985 is reduced from $ 322,807 to $ 89,682. Respondent also determined that petitioners were liable for the addition to tax pursuant to section 6661 because there was a substantial understatement of income tax for the taxable year 1985. OPINION Section *203 167(a)(1) provides that "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business." To qualify for such allowance, petitioners must show that the useful life of such an asset can be estimated with reasonable accuracy. No depreciation is permitted if the asset's useful life is indefinite or unlimited. Sec. 1.167(a)-3, Income Tax Regs.; Toledo TV Cable Co. v. Commissioner, 55 T.C. 1107, 1117 (1971), affd. 483 F.2d 1398 (9th Cir. 1973); Gulf Television Corp. v. Commissioner, 52 T.C. 1038, 1056-1057 (1969). Petitioners determination of the period of use of their allotment must be based upon "facts known or reasonably anticipated at the time a the return is filed." New England Tank Industries, Inc. v. Commissioner, 50 T.C. 771, 781 (1968), affd. 413 F.2d 1038 (1st Cir. 1969); Pasadena City Lines, Inc. v. Commissioner, 23 T.C. 34 (1954). Section 1.167(a)-1(b), Income Tax Regs., provides that "the estimated useful life of an *204 asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income." Such a period is determined by reference to the taxpayer's experience with similar property, taking into account present conditions and probable future developments. Other factors to be considered by the taxpayer include the normal progress of the economic changes, the current developments within the industry and the taxpayer's trade or business, and the climatic and other local conditions peculiar to the taxpayer's trade or business. Sec. 1.167(a)-1(b), Income Tax Regs.
Petitioners contend that they reached a reasonable conclusion that the allotment system would be terminated after the 1985 crop year. Petitioners maintain that after the enactment of the 1981 Act, there were only three possibilities for the future of the allotment system. First, in 1985 the peanut program would revert to the 1938 Act, as amended. Second, in 1985 Congress would adopt new legislation extending or modifying the peanut program established by the 1981 Act. Third, in 1985 the allotment *205 system would be terminated. Petitioners argue that given the history of the peanut program since 1977, the excessive Federal outlays and program losses, and the controversy surrounding the future of the peanut program, it was reasonable for petitioners to assume that Congress would not revert to the system under the 1938 Act, as amended, because the costs of the program would increase. Second, petitioners argue that it was reasonable for petitioners to assume that Congress would not extend or modify the system established by the 1981 Act because in 1981 no information was available to support such a conclusion and the political climate would not support such a conclusion. Petitioners argue that the most reasonable conclusion that they could reach in 1981 was that the allotment system would be terminated. Petitioners rely on Van De Steeg v. Commissioner, 60 T.C. 17 (1973), affd. 510 F.2d 961 (9th Cir. 1975), and Rev. Rul. 67-113, 1967-1 C.B. 55, as support for their position. Respondent presented several arguments in support of his position that petitioners are not entitled to a depreciation deduction for their allotment. *206 First, respondent argues that for an intangible asset to be depreciable, its useful life must be reasonably determinable based on past experience or other reliable factors. Second, respondent argues that the record in this case does not indicate that in 1981 petitioners had clear and convincing evidence that the peanut program would not be renewed in 1985 or that the underlying permanent legislation would be repealed. Third, respondent maintains that in 1981 the duration of petitioners' allotment could not be ascertained with reasonable certainty or accuracy. Fourth, respondent argues that petitioners did not reach a reasonable conclusion that the allotment system would be terminated in 1985. Finally, respondent contends that the facts in Van De Steeg v. Commissioner, supra, are distinguishable from the facts in this case. In Toledo TV Cable Co. v. Commissioner, supra, at 1123, this Court stated that if the taxpayer had been able to show that a new franchise differed materially from the original franchise, then the new franchise might be indicative of a new asset which would lead to the conclusion that the original franchise had *207 a determinable useful life. See Westinghouse Broadcasting Co. v. Commissioner, 36 T.C. 912, 919 (1961), affd. 309 F.2d 279 (3d Cir. 1962). Petitioners have not taken the position that their allotment was substantially changed with the 1981 Act. The 1981 Act provided that farms with allotments in effect in 1981 received an equivalent allotment measured in pounds for the years 1982 through 1985. This poundage quota was the same poundage quota for the farm in earlier years with some adjustments. Petitioners' farm records indicated that the rights under petitioners' allotment remained essentially unchanged with the 1977 and 1981 Acts. Testimony in this case of Ronald B. Ginn, a congressman in 1981, and Warren Cleveland, county executive for the Early County ASC Committee, which administers the farm programs established by Congress, indicated that allotments were converted into farm poundage quotas and that petitioners' rights under their allotment remained essentially unchanged. The record establishes that petitioners' rights under their allotment remained essentially unchanged under the farm poundage quota system. Therefore, we cannot conclude *208 that petitioners' allotment had a determinable useful life for that reason. We believe that the facts in this case are distinguishable from the facts in Van De Steeg v. Commissioner, supra. In Van De Steeg v. Commissioner, supra at 29, this Court held that the taxpayers' were entitled to a depreciation deduction for their Class I Milk Base, an intangible income-producing asset. The taxpayers were dairy farmers. The marketing of milk was regulated by the Puget Sound Federal Milk Marketing Order (the Order) which was promulgated pursuant to, and derived its statutory authority from, the Agricultural Marketing Agreement Act of 1937 (the 1937 Act). The Order provided for a milk base plan which was apportioned among producers and provided producers with the right to receive a premium price for a fixed quantity of milk. In 1965, the U.S. Congress enacted the Food and Agricultural Act of 1965 (the 1965 Act), which amended the 1937 Act by creating an intangible asset, known as the "Class I Milk Base," which could be adopted by amendment to the Order. The Order was amended in 1967 to add the Class I Milk Base to the base plan sections *209 of the Order. The taxpayers purchased a Class I Milk Base. The Class I Milk Base purchased pursuant to the 1967 amendment to the Order was to expire on December 31, 1969 and under a later amendment was to expire December 31, 1970. The taxpayers' milk base terminated on December 31, 1970, as provided. The provisions for the taxpayers' milk base were not carried over into the new milk base plan. The taxpayers depreciated their Class I Milk Base as an intangible asset with a determinable useful life. This Court noted that the taxpayers had a right to rely on the original stated term of the Class I Milk Base. This Court emphasized that even though the express expiration date was only one factor in determining whether the milk base had a useful life for only a limited period which could be estimated with reasonable accuracy, it was an important factor. Van De Steeg v. Commissioner, supra at 27. There are important differences between the facts in Van De Steeg v. Commissioner, supra, and the facts in this case. In Van De Steeg v. Commissioner, supra, the taxpayer's milk base was created in an amendment to permanent *210 legislation. The amendment had a specific termination date. In this case, petitioners' allotment was created in the 1938 Act, as amended, permanent legislation. The rights granted with petitioners' allotment under the 1938 Act, as amended, are permanent unless specifically terminated by amendment. The 1965 amendment to the 1937 Act in Van De Steeg v. Commissioner, supra, provided for an additional alternative method for distributing among the producers the proceeds from the sale of their milk. This method was terminated on the date the amendment terminated. In contrast, petitioners' allotment was created with the 1938 Act, as amended. The 1977 and 1981 Acts, in essence, continued the rights associated with petitioners' allotment under the poundage quota system. Even with the suspension of the allotment system with the 1981 Act, no new asset was created and petitioners' rights under the allotment were not terminated. We believe that the facts in this case more closely resemble the facts in prior cases where a livestock grazing preference or a cable television franchise was customarily renewed or where legislation providing for a right to a milk production *211 base did not have an express termination date. E.g., Uecker v. Commissioner, 81 T.C. 983 (1983), affd. 766 F.2d 909 (5th Cir. 1985) (grazing preference); Toledo TV Cable Co. v. Commissioner, 55 T.C. 1107 (1971)(franchise); Gulf Television Corp. v. Commissioner, 52 T.C. 1038 (1969) (franchise); Vander Hoek v. Commissioner, 51 T.C. 203 (1968) (right to base); Estate of Cordeiro v. Commissioner, 51 T.C. 195 (1968) (right to base); Westinghouse Broadcasting Co. v. Commissioner, 36 T.C. 912 (1961) (franchise); Shufflebarger v. Commissioner, 24 T.C. 980 (1955) (grazing preference). In Shufflebarger v. Commissioner, supra at 999, we held that a taxpayer's grazing preference was an intangible asset with an indeterminate useful life because the grazing preference could continue forever as it was not limited to time and was subject only to contingencies which may never happen. With this permit, the taxpayer allowed his livestock to graze upon land in national forests. The grazing preference was authorized by a *212 legislative act and regulations promulgated under that act. The grazing preference enabled the taxpayer to obtain a grazing permit. The grazing permit was customarily renewed, and it was against the policy of the enabling legislation not to permit such a renewal practice. In Toledo TV Cable Co. v. Commissioner, supra at 1125, we held that a taxpayer's cable television franchise which was authorized by a city ordinance and granted for a term of 10 years with an option to renew for an additional 10-year period was an intangible asset with an indeterminable useful life because there was a reasonable certainty of renewal. In Vander Hoek v. Commissioner, supra at 212, we held that the taxpayers' right to a milk production base did not have an ascertainable useful life and, therefore, was a nondepreciable asset. The taxpayers purchased a herd of dairy cows from a seller who was a member of a cooperative marketing association. The seller was required to market all milk from the herd through the association. The association allocated to the seller a milk production base which measured the seller's share in the proceeds of the association's *213 milk shares. The taxpayer was issued the same right to a milk production base. The formation of a cooperative marketing association and its power to provide the taxpayers with the right to base were provided for under the Milk Stabilization Act and earlier regulatory legislation. In effect, this legislation was permanent. Although petitioners did not rely on Chronicle Publishing Co. v. Commissioner, 67 T.C. 964 (1977), as support for their position, we believe it is necessary to distinguish the facts in that case from the facts in this case in order to reach the appropriate conclusion with respect to this case. In Chronicle Publishing Co. v. Commissioner, supra at 986, we held that the useful lives of 18 cable television franchises owned by the taxpayer's controlled group of subsidiaries were estimable with reasonable accuracy, and, therefore, the taxpayer's franchise was depreciable. In Chronicle Publishing Co. v. Commissioner, supra, this Court found that during the period in question 1967 through 1971 the cable television industry was growing at an explosive rate and that government regulations affecting *214 the industry were going through profound changes. In the early 1960's, the only governmental regulation of cable television was at the city or county level. In 1966 the Federal Communications Commissioner (FCC) asserted jurisdiction over cable systems. In 1967 the FCC asserted power to override local franchise provisions. In addition to this regulation, many States adopted different approaches to regulate cable television. During the years in issue in Chronicle Publishing Co. v. Commissioner, supra, the State of California considered various proposals for regulation of cable television. This Court noted that the responsibilities of the Federal, State, and local governments in the regulation of cable television were being studied and extensively changed such that the taxpayer did not know what Government requirements would have to be met as a condition of obtaining renewal franchises. This Court also found that technological advances were revolutionizing the type and nature of the services which franchise operators could provide. This Court also noted that none of the franchises and none of the enabling city or county ordinances under which the franchises *215 were granted contained renewal options. In Chronicle Publishing Co. v. Commissioner, supra, upon expiration of the franchise, the taxpayer had to compete with others to renew the franchise. In order for the taxpayer to obtain a renewal, FCC rules and regulations required a public hearing to consider the legal, financial, technical, character, and other qualifications of the taxpayer, with respect to an application for renewal. In this case, as in Chronicle Publishing Co. v. Commissioner, supra, the peanut program was being studied and debated in Congress. However, controversy over the peanut program had existed for many years, including prior to the enactment of the 1977 Act. Amidst this controversy, the peanut program, though modified, continued in force. The peanut program had been in existence for over 40 years and the legislation in this area remained essentially unchanged for that period. The passage of the 1981 Act can be viewed as evidence of the probable future of the peanut program. In Chronicle Publishing Co. v. Commissioner, supra, the franchise had a specific termination date and was not customarily *216 renewed. In this case, petitioners' allotment and the underlying legislation had no specific termination date and the rights under petitioners' allotment were customarily renewed every four years. Experience in this area indicated that the peanut program was a stable program that would continue unless Congress took action to terminate it. Even though the national poundage quota was reduced with successive farm bills, the evidence indicates that the United States was a major exporter of peanuts and that Congress wanted to maintain this status. Even though some congressmen wanted to terminate the peanut program, it was unlikely that with the success of the peanut program, Congress would do so. Prior to the enactment of the 1981 Act, Congress debated whether or not to continue the peanut program. Testimony by Mr. Ginn and other witnesses involved in the production and marketing of peanuts revealed that they believed the peanut program would be terminated in 1985. However, the opinion of Mr. Ginn and other witnesses in the peanut business of what would happen in 4 years with respect to the peanut program is highly speculative. It would be difficult to anticipate what would happen *217 in 1985 due to changes in members in Congress, changes in the attitude by such members toward the peanut program, and changes in the economy. In this case, such guesswork of congressmen and others in 1981 could not provide the basis for a reasonable conclusion as to the probable future development of the peanut program. In addition, the passage of the 1981 Act with the rights under the allotment system essentially carried forward is a fact which could be relied on by petitioners as evidence that the peanut program would probably be continued in the future. Based on the facts available or reasonably anticipated in 1981, petitioners could not have reasonably concluded that it was probable that their allotment would be terminated in 1985. Thus, the useful life of petitioners' allotment in 1981 was indefinite. Accordingly, we hold that petitioners' allotment is not subject to depreciation. We have concluded that petitioners' allotment has an indeterminable useful life, and, therefore, was not depreciable. Therefore, we will not consider the parties' arguments of whether it would be appropriate to depreciate the intangible asset in 1979 or 1982 or whether the intangible asset reverted *218 to an indeterminable useful life with the 1985 Act since the issues are now moot. Section 6661(a) imposes an addition to tax when there is a "substantial understatement of income tax for any taxable year." The rate of the addition to tax under section 6661(a) is equal to 25 percent of the underpayment attributable to the substantial understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). Petitioner bears the burden of proving that the additions to tax under section 6661(a) determined in the notice of deficiency are not applicable. Rule 142(a). Section 6661(b)(2)(A) defines "understatement" to mean the excess of the amount of tax required to be shown on the return over the amount of tax actually reported on the return. This understatement will be substantial if the amount of such understatement exceeds the greater of 10 percent of the amount of tax required to be shown on the return for the taxable year, or $ 5,000. Sec. 6661(b)(1)(A). The amount of the understatement is reduced by the portion of the understatement attributable to any nontax shelter item for which there was either substantial authority for the taxpayer's return position or adequate *219 disclosure in the return or in a statement attached to the return of the relevant facts affecting such item's tax treatment. Sec. 6661(b)(2)(B). Section 1.6661-3(b)(1), Income Tax Regs., [2] provides that there is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the taxpayer's position is substantial in relation to the weight of authorities supporting contrary positions. Petitioners contend that their position was based on substantial authority, and, therefore, they are not liable for additions to tax under section 6661. Petitioners relied on section 167 and the regulations thereunder; Rev. Rul. 67-113, 1967-1 C.B. 55; and Van De Steeg v. Commissioner, 60 T.C. 17 (1973). Petitioners submit that they took the identical position taken *220 by the taxpayers in Van De Steeg and that their factual situation is identical to the factual situation of the taxpayers in Van De Steeg in every material respect. Respondent contends that petitioners did not have substantial authority for determining that their allotment had a determinable useful life. Respondent asserts that the relevant statutory, regulatory, and case law pertaining to the issue presented does not prove that petitioners are entitled to the tax treatment they claim. According to respondent, petitioners' evidence for their position only establishes a mere uncertainty as to the continued existence of their allotment and, therefore, falls short of the regulatory requirements. Respondent asserts that petitioners have not met their burden of proof by citing authorities which are distinguishable on their facts and otherwise inapplicable. Respondent contends that in relying on Rev. Rul. 67-113, petitioners ignored the significant fact that the original stated term of their allotment was permanent, based on the underlying legislation. Respondent asserts that Van De Steeg v. Commissioner, supra, is not factually *221 identical to petitioners' case. We agree with respondent. We already determined that the facts in Van De Steeg v. Commissioner, supra, are distinguishable from the facts in this case. The weight of the authorities supporting petitioners' position is not substantial in relation to the weight of authorities supporting contrary positions. Therefore, we conclude that petitioners have failed to establish that there was substantial authority for the tax treatment of their allotment. Accordingly, we hold that petitioners are liable for the addition to tax pursuant to section 6661. Decision will be entered for the respondent. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Final regulations under section 6661 (T.D. 8017, 1985-1 C.B. 376) were published in the Federal Register on March 27, 1985 (50 Fed. Reg. 12,012↩).