David W. Boone, Atlanta, GA, for plaintiffs. William S. Stone and Simone R. Siez, Boone and Stone, W.T. Gamble, III, Collier and Gamble, LLP, Dawson, GA, of counsel.

Jane W. Vanneman, Washington, DC, with whom was Assistant Attorney General Peter D. Kiesler, for defendant. Terrence Jackson and Michael Gurwitz, Office of the General Counsel, Department of Agriculture, of counsel.

**MEMBERS OF THE PEANUT QUOTA HOLDERS ASSOCIATION, INC., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 02–1664C.

United States Court of Federal Claims.

April 30, 2004.

### OPINION

CHRISTINE O. C. MILLER, Judge.

This case is before the court after argument on defendant's motion for summary judgment and motion to dismiss plaintiffs' claim for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1) or, alternatively, for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6). Plaintiffs are a group farmers who held peanut production quotas that entitled them to certain benefits. In accordance with then-current regulations, plaintiffs leased their quotas to other farmers who produced peanuts and benefited from the leased quotas. A subsequent act of Congress eliminated plaintiffs' quotas and awarded benefits to actual growers. The issue before the court is whether the elimination of plaintiffs' quotas constituted a taking of property through federal regulation for which compensation is due under the Takings Clause of the Fifth Amendment.[1]

---

1. The parties agreed to defer action on plaintiffs' request for class action certification until the court ruled on defendant's dispositive motion. *See* Transcript of Proceedings, *Members of the*

*Peanut Quota Holders Assoc., Inc. v. United States,* No. 02–1664C at 4–5 (Fed.Cl. Jan.23, 2003).

## FACTS

The parties agree on the dispositive facts. The Peanut Quota Holders Association, Inc., is comprised of four residents of the state of Georgia who owned peanut quota allotments ("plaintiffs"). The peanut quota allotments that plaintiffs held were part of Congress's regulation of agricultural commodities, until they were eliminated by the Farm Security and Rural Investment Act of 2002, Pub.L. No. 107–171, 116 Stat. 134, codified at 7 U.S.C.A. §§ 7951–7960 (West Supp.2003) (the "2002 Act"), the subject of the present litigation.

In response to a national depression, Congress enacted the Agricultural Adjustment Act of 1938, currently codified at 7 U.S.C. § 1281 (2000) (the "1938 Act"), which terminated the free market production and sale of agricultural commodities within the United States, including peanuts. Or, as plaintiffs more colorfully put it, "Congress dismantled the free market agriculture system of this country, with the passage of … 'The 1938 Act.'" Pls.' Br. filed Nov. 20, 2003, at 3.[2] In 1949 regulation of the peanut market began to include price supports, under which certain producers received government-inflated prices through direct payments, in addition to existing restrictions on competition. Agricultural Act of 1949, 7 U.S.C. §§ 1421–1471j (the "1949 Act"). Support also took the form of marketing quotas, which allowed the owners to produce peanuts without penalty. *See* 7 U.S.C. § 1358 (2000). *See generally Competitive Enters. Inst. v. United States Dept. of Agric.*, 954 F.Supp. 265, 267–69 (D.D.C. 1996) (discussing regulation of peanut production); *Carruth v. United States*, 224 Ct. Cl. 422, 427–28, 627 F.2d 1068 (1980) (same).

Initially, these quotas were allotted by acre, on which the holder could produce his capacity of peanuts without penalty. The acreage on which quota peanuts could be produced was divided by state, county, and individual farms. Some farmers increased their quota holdings by purchasing them from the farmers to whom they were origi-

nally issued. *See* Affidavit of Faye Paulk, Nov. 12, 2003, at ¶ 8.

However, by 1977 technological improvements had increased substantially the yield of peanuts per acre, prompting Congress to enact the Food and Agriculture Act of 1977, Pub.L. No. 95–113, §§ 801–807, 91 Stat. 913 (the "1977 Act"). The 1977 Act instituted poundage quotas based on the weight of peanuts produced. The new poundage quotas applied only to peanuts destined for domestic edible use. Peanuts were not subject to the new quotas if grown for export or for crushing into oil. 7 U.S.C. §§ 1358(v), 1359(m) (1978). Quota peanuts received greater marketing assistance and higher loan amounts than non-quota peanuts.

By 1981 Congress terminated peanut quotas allocated by acre, leaving only the quotas based on poundage. The Agriculture and Food Act of 1981, Pub.L. No. 97–98, §§ 701–707, 95 Stat. 1213, 1248 (the "1981 Act"). The 1981 Act retained the two-tiered system based on poundage. Under the 1977 and 1981 Acts, a farmer who previously held an acreage quota now received a poundage quota. Although producers who did not benefit from holding a quota could produce peanuts, they did not receive the more generous support from the Government that the peanut quota holders received.

Due to the Government's managing of the peanut market, consumers paid a higher price for peanuts within the United States, and taxpayers absorbed the increasing costs of administering the program. These concerns gestated in Congress until the enactment of the Federal Agriculture Improvement and Reform Act of 1996, Pub.L. No. 104–127, § 155(i)(2), 110 Stat. 888, 928 (the "1996 Act"). The 1996 Act ended direct payments to producers and set loan rates through 2002.

The price support for peanut producers under the program took the form of marketing loans. The U.S. Department of Agriculture (the "USDA") extends loans to marketing associations, which, in turn, make loans

---

**2.** Congress's first attempt at regulating the agriculture market was in 1933, but that act was found unconstitutional because payments to farmers were funded by taxes on processors.

*United States v. Butler*, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936). Payments under the 1938 Act were effected by congressional appropriation from general federal revenues.

to peanut producers. The USDA sets loan rates and the loans are non-recourse, such that the producer is not personally liable for the loan. Instead, producers pledge their peanut crop as collateral for the loan. In the event that profits from the sale of the peanuts do not cover the loan amount, the marketing association, and, by default, the USDA, make up the difference. If the sale of the peanut crop does cover the loan amount, the producer repays the loan and retains any excess profit.

The 1996 Act froze the loan rate for quota peanuts at $610.00 per ton. By comparison, the loan rate for non-quota peanuts in 1997 was $132.00 per ton. 1996 Act, § 155(a)(2). The loan rate differential, combined with restrictions on production and importation, gave quota holders a considerable advantage in the peanut market.

Congressional tinkering with the program was constant from its inception, culminating with the 2002 Act. Pressured by free trade agreements and mounting administrative costs, Congress amended the program by repealing the marketing quota program, establishing a "buyout" of quota holders, and creating a new price support program. *See* 2002 Act, § 1309.

By repealing the marketing quota program contained in 7 U.S.C. §§ 1357–1359a (1996), plaintiffs lost the ability to receive financial assistance for producing peanuts and no longer enjoyed the benefit of reduced competition. Rather than leave former quota holders with no entitlement, Congress enacted a "buyout" as part of the 2002 Act. The buyout authorized a one-time payment to quota holders of $0.55 per pound, derived from a payment of $0.11 per pound for five years. 2002 Act, § 1309(b)(1).

After the 2002 Act, anyone could now grow and market unlimited quantities of peanuts without penalty or restriction. However, a price support program was retained under the 2002 Act. The new price support program included both direct payments to peanut producers and counter-cyclical payments, which allowed payments to be made to producers when the market price of peanuts was below a "target" set by the USDA. 7 C.F.R. §§ 1405, 1412 (2003). Rather than grant the new price support program to the same individuals who held quotas under the prior program, Congress crafted a new basis for the price supports that included only those who produced peanuts during the four years before enactment of the 2002 Act, 1998 to 2001. 2002 Act, § 1303. Anyone who produced peanuts during that period was assigned a base upon which price supports would be paid.

The 2002 Act defined eligibility for the new quota basis as a "producer on a farm in the United States that produced or was prevented from planting peanuts during any or all of the 1998 through 2001 crop years." 2002 Act, § 1301(5). Thus, the basis was available to "an owner, operator, landlord, tenant, or sharecropper that shares in the risk of producing a crop on a farm and is entitled to share in the crop available for marketing from the farm." *Id.* § 1301(8). This definition of producer differed from that in previous farm acts, including the 1996 Act, insofar as it excluded from consideration farmers who leased or transferred their quotas to other producers. 7 C.F.R. § 729.214(m) (2003). Prior to the 2002 Act, farmers were considered producers even if they had leased their quotas and, as a consequence, did not share in the risk of producing a crop.

In contrast to the 2002 Act, the 1996 Act specifically allowed quota holders to sell or lease their quotas to other producers. 1996 Act, § 155(i)(6)(A). The 1996 Act, like previous farm acts, not only allowed the transfer of quotas, but specifically protected transferors from a subsequent reduction in their quotas: "Any farm poundage quota transferred under this paragraph shall not result in any reduction in the farm poundage quota for the transferring farm if the transferred quota is produced or considered produced on the receiving farm." 1996 Act, § 155(i)(6)(D). The deferential treatment of quota lessors began as early as 1967 when quota holders were able to transfer or lease their peanut quotas and still be considered producers. *See* Pub.L. No. 90–211, 81 Stat. 658 (1967). This treatment ended when the 2002 Act created a new basis for awarding quotas, which specifically excluded lessors from consideration.

Plaintiffs are farm owners who had leased their peanut quotas to others who had produced peanuts during the 1998 to 2001 crop years. Although leasing of their quotas would not have affected plaintiffs' retention of their quota benefits under previous farm bills, plaintiffs now fail to meet the definition of producer under the 2002 Act and, as such, no longer are entitled to a peanut quota.

The 2002 Act places no restriction on the production of peanuts, and plaintiffs are free to produce as many peanuts as they can on their farms without penalty. Furthermore, marketing assistance is available to all peanut producers, including plaintiffs, although the marketing loan rate for non-quota peanuts is $355.00 per ton—significantly less than, for example, the $610.00 per ton and $495.00 per ton that Faye Paulk, one of the named plaintiffs, claimed to have received when she produced quota peanuts under the 1996 Act. *See* Paulk Aff. ¶ 16. Plaintiffs are also able to lease or transfer their farms for the production of peanuts. However, because plaintiffs no longer qualify for peanut quotas, they are unable to profit from leasing production quotas and receive lower loan rates if they produce peanuts themselves.

## DISCUSSION

### 1. *Jurisdiction and standard of review*

The Court of Federal Claims is empowered by the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." Because plaintiffs allege a taking of property without compensation, a violation of the Fifth Amendment, they assert a claim under the Tucker Act.

As defendant has relied on documents beyond the pleadings, summary judgment is the proper form for defendant's dispositive motion. *See* RCFC 12(b). When reviewing a claim of an improper taking, summary judgment may be appropriate: "[T]hat it is a takings case does not affect the availability of summary judgment when appropriate to the circumstances." *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996). "Whether or not a taking has occurred is a question of law based on factual underpinnings." *Wyatt v. United States,* 271 F.3d 1090, 1096 (Fed. Cir.2001). The primary issue is whether the 1996 Act created a protected property interest vested in a peanut quota holder that the 2002 Act eliminated improperly. This is a legal question that may be resolved on summary judgment. Plaintiffs contend that the 2002 Act rendered valueless expenditures made in reliance on their property interests in peanut quotas for the 2002 growing season. Moreover, by establishing a program of marketing loans open to all peanut producers, these legislative changes had the effect of decreasing the per-ton price of peanuts and thereby provided inadequate compensation to plaintiffs. Plaintiffs have alleged a taking by regulation.

Defendant rejects elevation of plaintiffs' quotas to possession of a constitutionally protected property interest. According to defendant, a license is not a protected property interest. Even if the quotas held by plaintiffs were protected interests, the Government has not acted beyond its regulatory role, interfered with reasonable investment-backed expectations, or had a significant economic impact on plaintiffs; no taking without compensation in violation of the Fifth Amendment therefore has taken place.

Plaintiffs challenge the appropriateness of summary judgment because they see disputed issues of material fact—to wit, the incidents of plaintiffs' property interests and the facts that underlie the alleged regulatory taking. They counter that, because the terms of the 1996 Act vested plaintiffs with protected property interests in their peanut poundage quotas, the quotas constitute property protected by the Fifth Amendment. The 2002 Act interfered with plaintiffs' reasonable investment-backed expectations, was not reasonably necessary to achieve a substantial public purpose, and had a significant economic impact on plaintiffs.

### 2. *Takings under the Fifth Amendment*

Plaintiffs' claim is based on the Fifth Amendment, which provides, in pertinent

part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court has recognized that the Government may take private property by either physical invasion or regulation. *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Wyatt,* 271 F.3d at 1096.

Property may be regulated without giving rise to a compensable taking. Nonetheless, "if regulation goes 'too far' it will constitute a compensable taking." *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153 (Fed.Cir. 1995). Limits are placed on the Government's regulation of private property flowing from the recognition that, if "subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].'" *Lucas,* 505 U.S. at 1014, 112 S.Ct. 2886 (citation omitted). To analyze plaintiffs' claim of regulatory taking, and determine if the regulation goes "too far," the court must make a "'two-tiered' inquiry into the government act alleged to have constituted a taking." *Chancellor Manor v. United States,* 331 F.3d 891, 901 (Fed. Cir.2003).

First, the court must consider "the nature of the interest allegedly taken to determine whether a compensable property interest exists." *Id.; M & J Coal Co.,* 47 F.3d at 1154 (analyzing whether the "interest was a 'stick in the bundle of property rights' acquired by the owner"). If plaintiffs are unable to prove that they held a protected property interest, their takings claim will fail. *Wyatt,* 271 F.3d at 1096 (holding that "only persons with a valid property interest at the time of the taking are entitled to compensation").

If plaintiffs succeed in meeting the first element, the court must determine whether the Government's action "constitutes a compensable taking of that interest for a public purpose." *Chancellor Manor,* 331 F.3d at 902; *see also M & J Coal Co.,* 47 F.3d at 1154. In making this determination, the Supreme Court has identified three factors to be considered: "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action." *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (citation omitted); *Maritrans Inc. v. United States,* 342 F.3d 1344, 1349–50 (Fed.Cir.2003) (articulating *Penn Central* factors as the "character of the governmental action at issue, the economic impact of the action on the claimant, and the extent to which the action has interfered with the claimant's distinct, investment-backed expectations").

### 3. Whether plaintiffs have protected property interests in peanut quotas

"[T]he Fifth Amendment concerns itself solely with the 'property,' *i.e.,* with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership." *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945). "The hallmark of a protected property interest is the right to exclude others." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 673, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). The right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

A citizen does not the possess the "right to exclude" when he voluntarily enters an area subject to government control. *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 216 (Fed.Cir.1993). Plaintiff in *Mitchell Arms* was a federally licensed firearms importer that entered into a contract to purchase and import rifles from Yugoslavia. Plaintiff previously had imported similar rifles with its valid permit during 1987 and 1988. In 1989, after plaintiff had purchased rifles to import into the United States, all import permits were suspended. When the U.S. Customs Service refused entry of the rifles for lack of a valid permit, plaintiff sued for just compensation for the suspension and subsequent revocation of the import permit.

The Federal Circuit held that the property owner in *Mitchell Arms* did not have a protected property interest in the import permit, reasoning:

> In revoking the permits, ATF withdrew its prior authorization for [plaintiff] to sell certain types of assault rifles in the United States. Otherwise, [plaintiff] retained complete control over the rifles. [Plaintiff] could have done anything it wished with the rifles, expect import them into the United States in their original configuration.

*Id.* at 217. Government action did not have the effect of taking plaintiff's rifles; rather, plaintiff lost only an expectation that the rifles could be marketed. This expectation was characterized as a mere "collateral interest" incident to plaintiff's property ownership (in the rifles) and is not, in and of itself, a property protected by the Fifth Amendment. *Id.; see also Allied–General Nuclear Servs. v. United States,* 839 F.2d 1572, 1577 (Fed. Cir.1988) (holding that plaintiff did not have protected property right in expectation that permit for nuclear facility would be granted if plant is constructed).

■ Because Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment. *Mitchell Arms,* 7 F.3d at 216 (citing *Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), for the proposition that "enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control").

■ While plaintiffs do hold protected property interests in their farm land and equipment, that protection does not extend to their marketing quotas. In *Conti v. United States,* 291 F.3d 1334, 1343 (Fed.Cir.2002), plaintiff held a swordfishing permit and contended that a ban on gillnet fishing constituted a taking. Although plaintiff held a property interest in his boats, nets, and gear, he did not hold such an interest in his permit. Affirming the denial of plaintiff's taking claim, the Federal Circuit noted that the ban on gillnet fishing affected his permit, but it had no effect on the value of plaintiff's boat, nets, and gear, as he was free to " 'sell the vessel and the gear, fish in a different fishery, or put both the nets and the vessel to other uses.' " *Id.* at 1343 (quoting *Conti v. United States,* 48 Fed.Cl. 532, 537 (2001)).

Plaintiffs in the case at bar are not alleging that the Government has prevented them from growing peanuts for sale, nor has any interest in plaintiffs' farms, crops, or equipment been seized. The heart of plaintiffs' claim is that the Government infringed on their expectation of continued peanut quota support. Over many years plaintiffs have come to rely on their peanut quotas as a principal source of income and claim that, in terms of the longevity of this program, time itself has transmuted their quotas into property rights. The nature of plaintiffs' asserted property interests and the impact of the 2002 Act on them are fully developed on this record, and no attribute of them is disputed.

The quotas that plaintiffs claim as property interests are akin to the permits in *Conti* and *Mitchell Arms.* Even though the quotas are business assets that create an expectation of enhanced commercial activity, they do not come within the safe harbor of property protected by the Fifth Amendment. The termination of plaintiffs' quotas by the Government has had no compensable effect on plaintiffs' protected property, *i.e.,* on their farms, crops, or equipment.

In support of their claims, plaintiffs array a series of decisions that have held a peanut quota to be a personal asset. *See Wenzel v. Comm'r,* 61 T.C.M. (RIA) 2396, 1991 WL 50155 (1991) (peanut quota, although an asset, may not be depreciated for tax purposes); *In re Williams,* 136 B.R. 311 (Bankr. M.D.Ga.1992) (holding peanut quota subject to treatment as property in debtor's bankruptcy estate); *Smith v. Smith,* 656 So.2d 814 (Ala.Civ.App.1994) (peanut quota property subject to division in divorce proceedings). While stating the well-accepted proposition that benefits conferred by federal legislation have attributes of property under tax law and may be treated as an asset, these rulings shed no light on the issue of whether peanut

quotas constitute property protected by the Fifth Amendment and do not challenge the rule that an expectation or benefit alone fails to qualify as a protected property right. *See Rogers Truck Line, Inc. v. United States,* 14 Cl.Ct. 108, 111–12 (1987) (concluding that plaintiffs possessed property interests in common carrier authorities, but not interests protected by Fifth Amendment, even though subsequent legislation rendered authorities valueless).

Plaintiffs concede the fundamental problem with their claimed right: "In this case, since a peanut quota is a creature of Congressional creation, the scope and dimension of such a property interest is dictated by the terms and conditions of the legislation." Pls.' Br. filed Nov. 20, 2003, at 18. Plaintiffs go on to clarify that they "do not disagree with the proposition that Congress is authorized to enact changes which discontinue the peanut quota system." *Id.* Despite this concession, plaintiffs make the contradictory argument that the 1996 Act quotas "are vested rights of Plaintiffs" that "endure beyond the specific crop year and remain property of Plaintiffs." *Id.* at 19. Although plaintiffs recognize that Congress has the power to change or terminate the program, the essence of their argument is that, once Congress has granted a benefit, it cannot be taken away.

For the 2002 crop year, plaintiffs contend that their investments and commitments "vested" a property right in the peanut quotas. Plaintiffs cite *Larionoff v. United States,* 533 F.2d 1167, 1189 (D.C.Cir.1976) (denying petition for rehearing), which held that a sailor who signed a re-enlistment contract with the Navy had vested a contractual right to an enlistment bonus. However, unlike the sailor in *Larionoff,* plaintiffs have failed to allege a significant financial *quid*

*pro quo,* akin to a commitment to serve additional years in the Navy, which would convert a Government gratuity into a right.[3]

Plaintiffs particularly object to the *ex post facto* operation of the 2002 Act. "Our Constitution expresses concern with retroactive laws through several of its provisions, including the *Ex Post Facto* and Takings Clauses." *Eastern Enters. v. Apfel,* 524 U.S. 498, 533, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality). While the Takings Clause safeguards against retroactive legislation affecting property rights, the Government's action in the instant case falls short of the concerns expressed in *Eastern Enterprises. See id.* at 528–29, 118 S.Ct. 2131 (discussing possibility "that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience").

Plaintiff in *Eastern Enterprises* was an employer of coal miners that signed agreements in 1947 and 1964 to provide benefits to retired and disabled employees. In 1965 plaintiff ceased coal mining operations, but nonetheless came within a 1992 Act of Congress requiring it to contribute to a combined fund for coal miner benefits of pre–1966 employees. The Supreme Court ruled that coverage based on remote events constituted a retroactive taking. Plaintiffs in this case have not alleged severe retroactivity similar to the decades that had passed in *Eastern Enterprises.* Changing the benefits conferred under the 1996 Act is not a comparable situation. Moreover, the persistent congressional refinement of the peanut quota program prevents plaintiffs from claiming that they could not have anticipated changes both operating prospectively and impacting

---

**3.** To support its holding, the court in *Larionoff* discussed and cited Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv. L.Rev. 692 (1960): "[T]he 'key element' with respect to whether a benefit is a gratuity appears to be 'the absence of any financial cost in the acquisition of the right based upon the original statute.'" 533 F.2d at 1189 n. 5.

The reliance necessary to convert a right from a gratuity "'is a financial detriment in the acqui-

sition of the right, and not merely reliance on the right after it accrues.'" *Id.* (quoting Hochman). Thus, in circumstances such as plaintiffs', where the "'gratuity is given by a statute for public purposes which are not controlled by the merits of the donee's claim to the right .... the Court is reluctant to permit the donee to obstruct a reassessment of these purposes by the legislature.'" *Id.*

benefits under the 1996 Act that the 2002 Act displaced.

Congress, not plaintiffs, has the sole right to define the scope and existence of the program over which plaintiffs have no right of exclusion. Because their takings claim thus fails the primary factor of the two-tier analysis, proceeding to the second factor is unnecessary. *See Maritrans Inc.*, 342 F.3d at 1351 ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment."); *Wyatt*, 271 F.3d at 1097 (requiring "existence of a valid property interest" for all takings claims).

Plaintiffs have failed to establish a property interest. As a matter of judicial efficiency the court is confident that, if a property interest were deemed present, plaintiffs would fail to meet the requisite *Penn Central* factors. Plaintiffs could not have held a reasonable investment-backed expectation that the quotas would continue because the peanut quotas were regulated heavily and had been subject to a litany of reductions and changes by Congress. *See Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." (citations omitted)).

The nature of the Government's action does not rise to a level of a taking. The underlying purpose and importance of the 2002 Act manifested a legitimate public undertaking, and the asserted property interests were not taken for the Government's own use. The elimination of plaintiffs' quotas has not had the requisite economic impact on the value of plaintiffs' property rights, including their ability to produce peanuts. *See Penn Central*, 438 U.S. at 137, 98 S.Ct. 2646 (finding no taking where plaintiff failed to demonstrate regulatory taking "denied *all*

use" of pre-existing right). *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (holding that "public program that adjusts the benefits and burdens of economic life to promote the common good" is not compensable taking); *Maritrans*, 342 F.3d at 1357–58 (reciting that "purpose of the Just Compensation Clause is not to deter the government from establishing regulations reasonably related to a publicly beneficial policy").

Defendant also seeks to dismiss plaintiffs' claim for violation of due process. Plaintiffs respond that their complaint contains only a claim for taking in violation of the Fifth Amendment and does not include an independent claim for a violation of substantive or procedural due process. Pls.' Br. filed Nov. 20, 2003, at 38. Because plaintiffs are not presenting such a claim, defendant's motion to dismiss is moot.[4]

## CONCLUSION

Based on the foregoing, the court concludes that a peanut quota is not a property interest protected by the Fifth Amendment. Accordingly,

**IT IS ORDERED**, as follows:

1. Defendant's motion for summary judgment on plaintiffs' takings claim is granted, and the Clerk of the Court shall enter judgment for defendant.

2. Defendant's motion to dismiss plaintiffs' due process claims is denied as moot insofar as plaintiffs have not alleged a substantive or procedural claim.

No costs.

---

4. Plaintiffs' reliance on *Coleman v. Block*, 562 F.Supp. 1353 (D.N.D.1983), similarly is moot, in that the right at issue was procedural due process, rather than a taking. In *Coleman* plaintiffs were farmers who sought to prevent the Government from terminating funds under a federal loan program through enforcement of their Fifth Amendment right to due process. Unlike plaintiffs in the case at bar, plaintiffs in *Coleman* based their claims on a loan contract with the Government and were seeking notice and an opportunity to be heard, rather than claiming a taking without compensation. *Id.* at 1357.