**M & J COAL COMPANY and Monongah Development Company, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–266L.

United States Court of Federal Claims.

Jan. 28, 1994.

Edward F. Heiskell, III, Morgantown, WV, for plaintiffs.

Gregory D. Page, Washington, DC, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on the parties' cross motions for summary judgment pursuant to RCFC 56. For the reasons set forth below the court grants defendant's motion and denies plaintiffs' motion.

## FACTS

### I. Background

The seeds of this dispute were planted in the early part of this century, when the owners of approximately seven hundred acres of real estate situated in the mountainous terrain of Lincoln District, Marion County, West Virginia began selling mining rights to various coal companies. Between 1904 and 1920 those owners, through various mineral severance deeds, sold for valuable consideration the right to mine the Pittsburgh seam of coal, which lay beneath the surface strata of their property. Included in the severance deeds was the right to mine "without being liable for any injury or damage done to the overlying surface, or to anything therein or thereon."

Plaintiffs in this action were owners of mining rights to the Pittsburgh seam. Plaintiffs acquired their rights after the Pittsburgh seam had been previously and successively mined by two coal companies: the Consolidated Coal Company, Inc. (Consol),

and Pittsburgh Coal Works, Inc. (PCW). By 1966, Consol had acquired all the rights to mine the Pittsburgh seam from the various coal companies that had purchased the original severance deeds. Sometime before 1970, Consol mined fifty to sixty percent of the coal contained in the Pittsburgh seam using a technique referred to as room-and-pillar mining. In turn, PCW mined coal and the coal pillars that Consol left in place.

After 1980, because of advances in mining techniques, it became possible to remove more coal from the Pittsburgh seam than was once possible using traditional room-and-pillar mining. Consequently, and because of high demand for Pittsburgh coal, Charles Sorbello and John Markovich became interested in purchasing and mining coal that both Consol and PCW left in place. Mr. Sorbello and Mr. Markovich estimated that between 1985 to 1989 they feasibly could remove approximately 75,000 to 100,000 tons of coal per year from what became known as the "Monongah mine." In making this estimate, they assumed they could subside structures where the surface owners had conveyed the right to subjacent support, and as to those structures required by law to be protected, the angle of draw would be 15 degrees[1].

Based on those estimates Mr. Sorbello bought all the corporate stock of the Monongah Development Company, the corporation that then owned the Monongah mine. In addition, Mr. Sorbello and Mr. Markovich formed the M & J Coal Company for the purposes of mining and selling the coal. In November and December 1985, M & J Coal invested a total of approximately $500,000 based on the expectation of recovering $400,-000 per year from mining and selling coal.

Before plaintiffs purchased their rights to the Monongah mine, Congress had passed the Surface Mining Control and Reclamation Act of 1977 (SMCRA), which regulates mining practices and techniques. 30 U.S.C. §§ 1201–1328 (1988). SMCRA empowers the Department of Interior to prohibit mining operations that endanger public health and safety or harm the environment:

> When, on the basis of any Federal inspection, the Secretary or his authorized representative determines that any condition or practices exist, or that any permittee is in violation of any requirement of this Act or any permit condition required by this Act, which condition, practice or violation also creates an *imminent danger to the health or safety of the public,* or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources, the Secretary or his authorized representative shall immediately order a cessation of surface coal mining and reclamation operations or the portion thereof relevant to the condition, practice, or violation.... Where the Secretary finds that the ordered cessation of surface coal mining and reclamation operations, or any portion thereof, will not completely abate the imminent danger to health or safety of the public or the significant imminent environmental harm to land, air, or water resources, the Secretary shall, in addition to the cessation order, impose affirmative obligations on the operator requiring him to take whatever steps the secretary deems necessary to abate the imminent danger or the significant environmental harm.

30 U.S.C. § 1271 (emphasis added).

From late 1985 to early 1990 plaintiffs mined more than 270,000 tons of coal from the Monongah mine. At the time plaintiffs began mining they did not have a mining permit as required by W.Va.Code § 22A–3–8 (1993); plaintiffs had applied for a transfer of the permit held by PCW, Permit No. UO–639, but the transfer did not take effect until March 28, 1986. Plaintiffs also adopted PCW's subsidence control plan, which required a 15–degree angle of draw under certain protected structures. However, plaintiffs did not submit that plan to the State of

---

1. The angle of draw determines the amount of coal that a mining company must leave under a structure to prevent subsidence-related damage. A 15–degree angle of draw requires that a mining company leave under a structure a pillar of coal delineated by dropping a vertical line 15 feet away from the structure on all sides, as enlarged by extension of a 15–degree angle from that vertical.

West Virginia until April 14, 1986, and the State did not approve it until April 25, 1986.

## II. Subsidence of the Dingus and Tarley Residences

On March 5, 1986 the seeds of this dispute began to sprout. On that day Carl Dingus filed a complaint with the West Virginia Department of Energy (WVDOE) alleging that deep mine operations had caused cracks in his driveway and breaks in his water line. State inspectors investigated the complaint and found that the damage had been caused by mining pursuant to Permit No. UO–639. Two days later the State issued a Notice of Violation (NOV) requiring the coal operator to fill in or repair large surface cracks. Because the transfer of PCW's permit to M & J Coal was not yet complete, the State issued the NOV against PCW.

On March 21, 1986 State and Federal inspectors conducted a joint inspection of the Dingus property, which resulted in the State issuing a NOV against M & J Coal for mining without a permit. The NOV required that M & J Coal cease mining until they obtained a permit. Six days later the State determined that plaintiffs had received but ignored the NOV and issued a formal cessation order. Also, around that time the State issued another NOV in which it ordered plaintiffs to cease mining until they notified all affected surface owners of the mining and possibility of subsidence. Apparently, plaintiffs had relied on notifications that PCW had given surface owners in 1983 and 1984.

During the inspection of the Dingus property, Joseph Tarley, a neighbor of Mr. Dingus, approached one of the state inspectors to complain of subsidence on his property. A few days later, on April 11, 1986, Mr. Tarley sent a letter to Charles Sheets of the Department of Interior's Office of Surface Mining Reclamation and Enforcement (OSM) complaining of subsidence which caused damage to his house and property. OSM responded by issuing the appropriate notice to the WVDOE advising them of Mr. Tarley's complaint.

April 25, 1986 was an eventful day. At 10:45 a.m. Mrs. Tarley called William Berthy, an OSM inspector, to discuss the subsidence of her house and property. Inspector Berthy advised her that earlier that day the WVDOE had approved M & J Coal's subsidence control plan and had authorized it to continue mining. Later that day, at 1:00 p.m., Mr. Tarley called OSM and talked to Charles Sheets. Mr. Tarley advised Mr. Sheets that on the preceding day his house had subsided and that he presently was in the process of moving out. Mr. Tarley described the damage:

> The needle on the gas meter had been spinning wildly. The section of the gas line immediately adjacent to the gas meter was severed. My water line to the public water supply also broke, and the access wires that the electric company had installed outside our house were leaning and stretching as tight as a fiddle string.
>
> Fortunately, the gas line broke outside our house. In my experience, if the gas line had broken in the house—which could have happened—there probably would have been an explosion, due to the fact that there is a hot water pilot in the basement. If this had occurred, my wife and daughter, and possibly some of our neighbors, would have died or been seriously injured. During this time, my family feared for its and our neighbors safety.

Of the cracks in his yard Mr. Tarley stated:

> I could not see the bottom but observed it widening while I looked. My neighbor's dog, which could have just as easily been a child, later fell into the crack outside the house. Although the dog, from the barking and crying sounds it made, survived the fall, it later died because rescue attempts were unsuccessful.
>
> Even the initial cracking presented a dangerous situation. I believed that neighborhood children could easily have fallen into the crack and injured themselves. I reported this problem to the U.S. Office of Surface Mining in early May 1986. I observed that trespassers, probably children or juveniles, were endangering themselves by entering my property and attempting to remove items from the wreckage that we could not salvage.

### III. OSM's Enforcement Activities

In the late afternoon of April 25, 1986, Charles Sheets, Mike Superfesky, and William Berthy, all OSM officials, met at the Tarley residence. The OSM officials observed the Tarley family loading their belongings into a moving van. Based on his observations of the scene, Mr. Superfesky found it necessary to order evacuation of the house: a large crack (greater than one foot wide) in the front yard propagated through the house; the front foundation was pulled five inches from the basement floor; the western foundation wall contained severe diagonal cracks four to six inches wide; there was a six-inch crack in the concrete basement floor near the furnace; and the front foundation and rear of the house was buckled. The subsidence of Mr. Tarley's house was so severe that Mr. Tarley had to install wood block cribbing and steel jack posts in the recreation room to prevent total collapse of the house.

Mr. Superfesky and Mr. Sheets spoke of the subsidence with Mike Nunan of the WVDOE, who stated that M & J Coal was in compliance with all applicable state statutes, rules, and regulations, and that the State wasn't going to issue any enforcement actions. Nonetheless, both Mr. Sheets and Mr. Superfesky believed that "no one has a right to subside another person's house," and, on April 25, 1986, issued a cessation order against M & J Coal "for a condition, practice, or violation creating an imminent danger to the health and safety of the public." According to Mr. Superfesky, OSM's main concern was that someone would fall into cracks or that the structure would fall on someone. In addition, OSM responded to evidence showing that the subsidence had ruptured natural gas and water lines and shifted the earth so as to move electric power poles and stretch power lines.

The cessation order required that M & J Coal (1) protect the public from surface cracks, (2) restore the subsided land's pre-subsidence capacity to support structures and previous uses, and (3) mine pursuant to a revised subsidence control plan. The cessation order was in effect for five days; on April 30, 1986, OSM approved a revised sub-sidence control plan for M & J Coal and lifted the cessation order. The new subsidence control plan required M & J Coal to increase the angle of draw under protected structures from 15 degrees to 30 degrees and, in contrast to the previous subsidence control plan, required that M & J Coal protect single family dwellings. Hence, the new plan compelled M & J Coal to leave more coal under protected structures and increased the number and nature of the structures that M & J had to protect.

Pursuant to 30 U.S.C. § 1275(a)(1), plaintiffs appealed OSM's cessation order. An administrative law judge (ALJ) and the Department of Interior's appellate tribunal, the Interior Board of Land Appeals (IBLA), adjudicated plaintiffs' appeal. The ALJ convened a formal hearing in which plaintiffs were represented by private counsel, presented their own witnesses, and cross examined the government's witnesses. During the hearing, plaintiffs made two arguments: (1) their mining had not caused the subsidence that gave rise to the cessation order; and (2) the cracks were not large enough to endanger public safety. However, the ALJ and the IBLA rejected both these arguments. *M & J Coal Co. v. Office of Surface Mining Reclamation and Enforcement,* Docket No. CH 6–15–R (1988); *M & J Coal Co. v. Office of Surface Mining Reclamation and Enforcement,* 115 IBLA 8 (1990). They concluded that plaintiffs caused the subsidence of the Tarley and Dingus residences and that subsidence of that type could threaten the public in the future if it recurred. *Id.*

### IV. Post–Enforcement Subsidence

Despite OSM's intentions, the revised subsidence control plan did not prevent future damage to the public. During the four years following the revision, cracks appeared in property owned by Mr. Wright; a section of Route 218 subsided; the water tank of the town of Worthington subsided; and Weadon Koon observed subsidence of his property which destroyed his fishpond and damaged his house. Defendant adduced expert testimony, which relied on bore hole camera technology, that all this damage was caused by plaintiffs' underground mining operations.

Plaintiff provided no evidence to rebut defendant's assertion.

Mr. Wright, whose property was approximately 2,000 feet from the Dingus and Tarley residences, first noticed subsidence of his property in or about late October 1986.[2] At that time he observed a crack on his land about one inch wide and about ten feet long. Over the next several days the width and length of the crack increased to six inches and twenty feet, respectively. On November 4, 1986 a section of approximately ninety to one-hundred feet of Route 218 subsided, accompanied by additional subsidence of Mr. Wright's property. The subsidence of Route 218 and the new subsidence on Mr. Wright's property eventually joined, forming an oval shape approximately one-hundred feet long and eighty-five feet wide. According to Mr. Wright, the road initially subsided three to six feet, and about an hour later a six-to-eight-inch-wide crack appeared in the sunken area. In response to this subsidence the State issued a NOV, pursuant to W.Va.Code § 22A–3–14(b)(1), requiring plaintiffs to repair the damage they caused. Plaintiffs complied with this NOV.

Route 218 is used regularly by commuters, businesses, school buses and state and municipal workers, including policemen, firemen and other emergency workers. On average, 4,500 vehicles travelled on Route 218 each day. In addition to damaging the road, the subsidence witnessed by Mr. Wright endangered an adjacent gas line and a 7,200 volt electric line, thereby necessitating protective excavation of the gas line and replacement of the electric power pole.

Approximately eleven months after the collapse of Route 218, the water tank of the town of Worthington subsided. Mayor Tracy Smith described the damage:

> The tank serves the Swisher's Hill and Helen's Run areas of Worthington, supplying water to roughly 104 families. The tank sits on a cement ring wall, which is approximately eight inches thick and 22 feet in diameter.

As a result of the subsidence, the ring cracked, causing the tank to tilt to one side, lifting the opposite side approximately one inch off the ground. Worthington's independent engineering consultant, Thresher Engineering, reported that because subsidence caused two cracks in the foundation, the water tank began pulling away from the foundation along approximately 65 percent of the ring wall's circumference. Fearing that the tank would topple, I had the tank filled to ½ or ⅔ capacity, thereby reducing its weight.

> Although the water tank continues to function, I and Thresher Engineering are concerned that this subsidence will impair the tank's stability in the long run. For this reason, I was and still am concerned that this subsidence will endanger the safety of Worthington residents. A temporary or permanent loss of the water tank would be a dangerous situation because it would discontinue water service for general and emergency purposes, including fire fighting and health exigencies. To date the Town of Worthington does not have the funds needed to mitigate the previous subsidence by stabilizing its water tank.

On November 21, 1987, the State issued a NOV, pursuant to W.Va.Code § 22A–3–14(b)(1), requiring plaintiffs to repair the damage they caused to the water tank. Plaintiffs complied with this NOV.

Approximately three years later, on November 24, 1990, Weadon Koon observed cracks in his living room, kitchen and basement. In addition, subsidence under his fish pond resulted in its complete destruction. M & J Coal filled those cracks at its own expense.

## V. Plaintiffs' Claim

After completing their mining operations in the Monongah mine, plaintiffs filed suit in this court alleging a taking under the Fifth Amendment. Plaintiffs alleged that OSM's enforcement actions which required plaintiffs to increase the draw angle under protected structures and to protect single family dwell-

---

**2.** The record does not indicate whether Mr. Wright's deed to his land included the right to subjacent support.

ings deprived plaintiffs of 99,700 tons of coal they otherwise would have mined, and resulted in $580,000 in lost profits. Plaintiffs did not and could not challenge the validity under SMCRA of OSM's enforcement actions against M & J Coal. Plaintiffs already lost and failed to appeal such a challenge. Rather, plaintiffs' complaint averred that OSM's enforcement actions constituted a "regulatory taking." More specifically, plaintiffs alleged that by requiring M & J coal to modify its subsidence control plan OSM deprived M & J Coal of its right to mine coal, and that such deprivation constituted a taking of plaintiffs' property rights without compensation in violation of the Fifth Amendment.

While plaintiffs may have suffered lost profits as a result of OSM's enforcement actions, plaintiffs mining operations were otherwise profitable. Plaintiffs' total profit from their mining operations—as calculated by subtracting M & J Coal's reported losses from the sum of Charles Sorbello's and John Markovich's total salaries and M & J Coal's total profits—was $692,086.41. When this figure is divided by M & J Coal's cost basis, plaintiffs total rate of return during the entire operation was 138 percent, or 34.5 percent annually. Except for a period of approximately five days, occasioned by OSM's cessation order, plaintiffs never laid off any part of their Monongah Mine work force of approximately 12 employees either before or after they adopted the 30–degree plan. Other than the coal they mined, plaintiffs never sold any of their property or other assets. None of plaintiffs' actual or prospective customers refused to transact, contract, or otherwise do business with plaintiffs as a result of either OSM's cessation order or the 30–degree plan. During most of the quarterly period after OSM issued its cessation order, and during each year from 1985 to 1989 inclusive, plaintiffs' Monongah Mine coal production increased.

## DISCUSSION

### I. Summary Judgment

■ Summary judgment is appropriate when "there is no genuine issue as to any material fact" so that the moving party "is entitled to judgment as a matter of law."

RCFC 56(c). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Chevron U.S.A., Inc. v. United States,* 17 Cl.Ct. 537, 540 (1989), *rev'd on other grounds,* 923 F.2d 830 (Fed.Cir.1991). When the moving party has carried its burden, the non-moving party must come forward with specific facts showing that a genuine issue for trial exists, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), and the non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.,* 583 F.2d 852, 856 (6th Cir. 1978); *Tunnell v. Wiley,* 514 F.2d 971, 976 (3d Cir.1975). "[When] the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

■ In Fifth Amendment takings cases courts should grant a motion for summary judgment only in unusual circumstances involving extraordinary facts. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983). The question of whether a taking has occurred is frequently fact-intensive, requiring the development of a complete record through trial. *Id.* Summary judgment is appropriate in this case, however, because the parties have stipulated to all the facts necessary to make a decision on the merits.

### II. Regulatory Takings Analysis

■ As a general rule, the government is not required to pay for the incidental effects

of its laws and regulations. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). As stated by Justice Holmes, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). However, when a governmental restriction goes too far, the government must compensate those it harms. *Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992); *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. How far is too far depends on the facts and circumstances of each case. *Id.*

■■■■ In deciding whether a governmental restriction constitutes a "taking," courts engage in *ad hoc*, factual inquiries that consider several factors. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. Of particular importance is the extent to which the restriction has interfered with distinct investment-backed expectations. *Id.* Interests that are not sufficiently bound up with the reasonable expectations of the claimant are not "sticks" in the claimant's "bundle of rights" and thus do not constitute property for Fifth Amendment purposes. *Id.* at 124–25, 98 S.Ct. at 2659–60. The economic impact of the restriction on the claimant also is important. *Id.* at 124, 98 S.Ct. at 2659. However, even where a governmental restriction deprives a claimant of all economically beneficial use of its property, the government may resist compensation if the proscribed interests were not part of the title to begin with. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2899. For example, a government action is not a taking regardless of the extent of the deprivation, if it proscribes a use that previously was impermissible under relevant property and nuisance principles. *Id.* —— U.S. at ——, 112 S.Ct. at 2901. Those principles include federal laws. *Preseault v. United States*, 27 Fed.Cl. 69, 88 (1992).

■■■■ The above precedent suggests a two-tiered approach to analyzing a takings claim. First, a court must determine whether the claimant held a property right that is compensable under the Fifth Amendment. *Preseault*, 27 Fed.Cl. at 87; *Board of County Supervisors v. United States*, 23 Cl.Ct. 205, 208 (1991). A compensable right does not exist if it was not part of the claimant's title at the time the claimant took title to the property. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2899; *Preseault*, 27 Fed.Cl. at 87. For example, if at the time of sale an existing law or regulation precluded a certain use, that use was never a "stick" in the purchaser's "bundle of rights." *Lucas*, —— U.S. at ——, 112 S.Ct. at 2899–90; *Preseault*, 27 Fed.Cl. at 84. Second, if the claimant establishes the existence of a compensable right, the court must determine whether the governmental action constituted a taking of that right. In making that determination the court must consider (1) the nature of the government's action, (2) the economic impact on the claimant, and (3) the extent to which the action interfered with the claimant's legitimate investment-backed expectations. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659; *Tabb Lakes, Inc. v. United States*, 26 Cl.Ct. 1334, 1345 (1992).

### III. The Merits of Plaintiffs' Takings Claim

Plaintiff alleged that OSM's enforcement actions requiring M & J Coal to modify its subsidence control plan constituted a taking of its property without just compensation. This purported "taking" had two parts: (1) the new plan required M & J Coal to mine pursuant to a 30–degree subsidence control plan; (2) the new plan added single family dwellings to those structures that M & J had to protect. Each part requires a separate analysis.

A. OSM's Enforcement Action Requiring That M & J Coal Mine Pursuant to a 30–Degree Subsidence Control Plan Was Not a Taking of a Cognizable Property Right.

■■■■ One of the property rights that plaintiffs alleged they lost was the right to mine coal pursuant to a 15–degree subsidence control plan; plaintiffs claimed damages for the quantity of coal that they had to leave in the ground as a result of OSM requiring them to mine pursuant to a 30–degree plan instead of a 15–degree plan.

However, plaintiffs failed to establish any legally cognizable right to mine coal in accordance with a 15–degree plan. Plaintiffs pointed to no state or federal law, regulation, permit, or practice that gave them such a right. The right that plaintiffs alleged derived solely from plaintiffs' subjective evaluation of standard mining practices in West Virginia. At the time plaintiffs purchased their mining rights they knew that they could not mine coal so as to damage structures that West Virginia law required them to protect. Plaintiffs assumed that the angle of draw necessary to protect such structures would be 15 degrees. They based that assumption not on any state-approved standard or practice but on their own understanding of common mining practices in West Virginia. Plaintiffs developed that understanding from a review of literature on the subject and from their own experience in the mining industry.

Subjective evaluations of what the law requires, such as those held by plaintiffs, cannot form the basis for a legally cognizable right in a takings analysis. A contrary finding would place in the hands of the individual the power to create rights recognized by society. Our form of democracy does not permit such a result. State laws requiring plaintiffs to protect certain structures from damage caused by underground mining operations were in place at the time plaintiffs purchased their mining interests. Plaintiffs cannot claim that their own understanding of what those laws might require for them should trump a different understanding by OSM. Such a finding would render the regulations meaningless.

Plaintiffs also did not establish an expectancy right to mine under a 15–degree plan. Under West Virginia law, each coal operator must obtain a state permit before beginning mining operations. W. Va.Code § 22A–3–8 (1993). The permits are subject at all times to modification or suspension by OSM. 30 U.S.C. § 1271(a)(2); *see also* 30 U.S.C. § 1271(b). At the time plaintiffs purchased their mining rights to the Monongah mine they did not have a permit that granted them the right to mine under a 15–degree plan. However, even if they had such a permit, that permit would have been subject at all times to modification by OSM. Plaintiffs knew or should have known of that possibility at the time they made their investment. Thus, they never had a legitimate expectation of mining coal using any specific angle of draw. The angle of draw that the State or OSM would require plaintiffs to use was an uncertainty that was part of the business risk that plaintiffs took when they made their investment. Plaintiffs knowingly entered into a highly regulated industry; they cannot claim OSM's execution of existing regulations was unforeseeable at the time they made their investment.

Plaintiffs' only cognizable expectation was that OSM would act within scope of its regulatory authority. An ALJ and the IBLA already decided that OSM's enforcement actions were legitimate exercises of OSM's authority, under 30 U.S.C. § 1271, to protect public health and safety. The court cannot at this juncture re-litigate that issue.[3] Moreover, post-enforcement subsidence highlights the prudence of OSM's actions; even the 30–degree plan did not prevent the collapse of Route 218 or subsidence to the Town of Worthington's water tank. Those events posed serious threats to the health and safety of the public.

The existence of a cognizable property right is a prerequisite to finding a governmental taking. *See Lucas*, —— U.S. at —— ––——, 112 S.Ct. at 2899–90; *Preseault*, 27 Fed.Cl. at 84; *Board of County Supervisors*, 23 Cl.Ct. at 208. The right to mine under a 15–degree plan was not part of plaintiffs' title when they purchased their rights to the Monongah mine. Accordingly, their takings claim which was founded on that right must fail. Plaintiffs cannot recover for deprivation of a right they never had. *Id.*

**3.** For the purposes of this case the court must assume that the agency acted within the scope of its authority. The court has jurisdiction over this case pursuant to the Tucker Act. 28 U.S.C. § 1491 (1988). Under the Tucker Act this court may not award damages for unauthorized agency action. *Florida Rock Industries, Inc. v. United States*, 791 F.2d 893, 898 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

B. OSM's Enforcement Action Requiring M & J Coal to Protect Single–Family Dwellings Was Not a Taking of a Cognizable Property Right.

▪ Plaintiffs also alleged that by requiring them to protect all single family dwellings the government usurped a right that they had purchased: the right to mine under certain land without being liable for damages caused to the surface. Plaintiffs averred that surface owners sold away their right to structural support through mineral severance deeds granted between 1904 and 1920, and that OSM's actions amounted to a reassignment of such structural rights from plaintiffs to the surface owners. According to plaintiffs, that reassignment constituted a taking without just compensation in violation of the Fifth Amendment.

As before, plaintiffs failed to establish that they owned the right that was the basis for their claim. At the time plaintiffs purchased their rights to the Monongah mine, SMCRA forbade any coal operator from engaging in mining practices that endanger public health and safety. 30 U.S.C. § 1221. A title to property does not include rights forbidden by law at the time title transfers. *Lucas,* —— U.S. at ——-——, 112 S.Ct. at 2899–90; *Preseault,* 27 Fed.Cl. at 84. Because plaintiffs' title was limited at all times by SMCRA, their only legitimate expectation was that OSM would act within the scope of its regulatory authority in enforcing SMCRA. The IBLA and an ALJ determined that OSM's actions requiring plaintiffs to protect single-family dwellings were legitimate exercises of OSM's regulatory authority. In finding that OSM's actions were necessary to protect public health and safety, the IBLA stated:

> It cannot be seriously contended that ruptured gas and water pipes, twisting and cracking walls, doors and windows separating from their mountings, chimneys separating from furnaces, and large cracks in the surface do not present an expectation of death or serious injury to the rational person exposed to such conditions. The record presents a graphic picture of an imminent danger situation and although little could be done to protect the Dingus

and Tarley residences, the Millers [neighbors of Mr. Tarley and Mr. Dingus] and their property were clearly threatened. The surface cracks had proceeded through the Tarley property and onto Miller's property on April 25, 1986, and at the inspection on that day, Miller informed [OSM] of his safety concerns. M & J's contentions to the contrary lack merit and deserve no additional discussion.

*M & J Coal Co.,* 115 IBLA at 23–24. The ALJ also noted that the purpose of OSM's actions was "that of protecting other nearby residents whose residences would also be put at risk by M & J's continuing underground mining activity." *M & J Coal,* Docket No. CH 6–15–R at 10.

While it is not the purpose of this court to review the findings and conclusions of the IBLA or ALJ, the court does agree with them. OSM's enforcement actions may have had the incidental effect of benefitting surface owners, but the court is satisfied that OSM's actions were necessary to protect public health and safety. When M & J Coal caused private homes to subside, they endangered not only the owners of the homes but the community. The subsidence of the Dingus and Tarley residences caused gas lines to rupture, power lines to stretch, water lines to burst, and resulted in large cracks in the earth's surface. It is common sense that: broken gas lines could ignite spreading fire throughout the neighborhood; fallen power lines could spark fires and present a hazard to children in the community; ruptured water lines could disrupt water service to the community, exacerbating the problems that spreading fires would create; and large cracks in the ground create a hazard to children that might wander into the area. All those conditions would unfold without warning, as "subsidence occurs, seemingly on a random basis, at least up to 60 years after mining." H.R.Rep. No. 218, 95th Cong., 1st Sess. 126 (1977) *reprinted in* 1977 U.S.C.C.A.N. 593, 658. OSM acted to prevent the spontaneous development of dangerous conditions. The court agrees that OSM's actions were necessary to protect public health and safety.

Included in plaintiffs' title was the right to mine coal without being liable for damages to surface owners. However, that right was limited at all times by OSM's power to ensure the health and safety of the public. Plaintiffs therefore could not claim that OSM's enforcement actions exacted a right that plaintiffs had purchased. OSM's actions did not require plaintiffs to pay for damages they already caused to the homes of surface owners; they did not require plaintiffs to change their mining operations where danger to homes did not exist, such as in open farmland; and they did not cause plaintiffs to cease all mining operations under private homes. Rather, OSM's actions only required plaintiffs to leave more coal under single family dwellings in order to prevent the occurrence of a hazardous condition, the spontaneous collapse of a house.

### C. Plaintiffs' Case Differed Materially From *Pennsylvania Coal v. Mahon.*

Plaintiffs argued that their case could not be distinguished in any meaningful or substantive way from the Supreme Court's decision in *Pennsylvania Coal v. Mahon,* 260 U.S. at 392, 43 S.Ct. at 153. Plaintiffs also argued that the Supreme Court's decision in *Pennsylvania Coal* was not overruled by the Court's subsequent holding in *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). Plaintiffs' latter argument was correct, but not the former.

Plaintiffs correctly argued that the Supreme Court's decision in *Keystone* did not expressly overrule its decision in *Pennsylvania Coal.* In fact, the Court distinguished its decision in *Keystone* on at least two grounds.[4] *Keystone,* 480 U.S. at 485, 107 S.Ct. at 1241–42. Nonetheless, *Keystone* casts a shadow over *Pennsylvania Coal,* leaving the holding of *Pennsylvania Coal* in question. This court need not determine the extent of that shadow, however, because it finds that plaintiffs' case differed materially from *Pennsylvania Coal.*

*Pennsylvania Coal* involved the validity of the Kohler Act, which the Pennsylvania legislature passed on May 27, 1921. *Pennsylvania Coal,* 260 U.S. at 412, 43 S.Ct. at 159. The Kohler act gave landowners the right to prevent coal operators from mining under their property in such a way as to cause subsidence of their land. The plaintiff in *Pennsylvania Coal* was a coal operator that, in 1878, had purchased the surface owner's rights to subjacent support. *Id.* When those surface owners invoked the Kohler act to prevent the Pennsylvania Coal Company from mining under their property, the Pennsylvania Coal Company responded with a takings claim. It alleged that the Kohler Act, as applied, constituted a taking by the State of Pennsylvania without just compensation. *Id.* The Supreme court agreed. *Pennsylvania Coal,* 260 U.S. at 414–15, 43 S.Ct. at 159–60.

Plaintiffs' case differed from *Pennsylvania Coal* in two ways. First, and of greatest importance, plaintiffs in this case purchased their mining rights several years after the passage of SMCRA. Thus, the bundle of rights plaintiffs purchased was subject to the limitations of SMCRA. In contrast, the Kohler Act was passed more than forty years after the Pennsylvania Coal Company purchased its mining rights. *Id.* at 412, 43 S.Ct. at 159. Therefore, the application of the Kohler Act exacted rights that the Pennsylvania Coal Company had purchased; OSM's enforcement of SMCRA did not have such an effect on plaintiffs. Second, the Supreme Court found that the purpose of the Kohler Act was to benefit surface owners at the expense of the owners of the mineral rights. *Id.* at 413, 43 S.Ct. at 159. In this case, however, OSM responded to protect public health and safety in the future. Despite what plaintiff argued, OSM did not act to benefit either Mr. Tarley or Mr. Dingus; their houses had already subsided. In *Keystone,* the Supreme Court found such a public purpose to be a significant factor in distinguishing the *Keystone* holding from that in *Pennsylvania Coal.* *Keystone,* 480 U.S. at 485, 107 S.Ct. at 1241–42. The public pur-

---

4. The Supreme Court stated the cases differed with respect to the (1) character of the governmental action involved, and (2) the extent of the interference with investment-backed expectations. *See Keystone Coal,* 480 U.S. at 485, 107 S.Ct. at 1241–42.

pose behind OSM's actions similarly distinguish the holding of this case from that of *Pennsylvania Coal.* Accordingly plaintiff's reliance on *Pennsylvania Coal* was inapt.

## CONCLUSION

Plaintiffs' takings claim hinged on the establishment of a cognizable property right to mine pursuant to a 15-degree subsidence control plan and to subside private dwellings. Because plaintiffs failed to establish either of those rights, their takings claim must fail. Accordingly, the court grants defendant's motion for summary judgment and denies plaintiffs' cross motion. The Clerk is directed to dismiss the complaint. No costs.

**IT IS SO ORDERED.**