**M & J COAL COMPANY and Monongah Development Company, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 94–5081.

United States Court of Appeals, Federal Circuit.

Feb. 15, 1995.

Edgar F. Heiskell, III, Charlestown, WV, argued, for plaintiffs-appellants.

Jeffrey P. Kehne, Environment & Natural Resources Division, Dept. of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were Lois J. Schiffer, Acting Asst. Atty. Gen., James E. Brookshire, Gregory D. Page and Albert M. Ferlo, Jr. Also on the brief were Thomas A. Bovard, Jean R. Goldfarb and John Jasper, Office of Sol., U.S. Dept. of Interior, Washington, DC, of counsel.

Before MAYER, Circuit Judge, BENNETT, Senior Circuit Judge, and LOURIE, Circuit Judge.

LOURIE, Circuit Judge.

M & J Coal Company and Monongah Development Company (collectively "M & J") appeal from a judgment of the United States Court of Federal Claims granting the government's motion for summary judgment. *M & J Coal Co. v. United States*, 30 Fed.Cl. 360 (1994). Because M & J failed to establish that the government's action in regulating its coal mining operations effected a taking of private property without compensation in violation of the Fifth Amendment to the United States Constitution, we affirm.

## BACKGROUND

This regulatory takings case involves the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), which regulates mining practices and techniques. *See* 30 U.S.C. §§ 1201–1328 (1988). SMCRA authorizes the Department of the Interior to prohibit mining operations that endanger public health and safety or harm the environment. In relevant part, SMCRA provides as follows:

When, on the basis of any Federal inspection, the Secretary or his authorized representative determines that any condition or practices exist, or that any permittee is in violation of any requirement of this [Act] or any permit condition required by this [Act], which condition, practice or violation also creates an imminent danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources, the Secretary or his authorized representative shall immediately order a cessation of surface coal mining and reclamation operations or the portion thereof relevant to the condition, practice, or violation.... Where the Secretary finds that the ordered cessation of surface coal mining and reclamation operations, or any portion thereof, will not completely abate the imminent danger to health or safety of the public or the significant imminent environmental harm to land, air, or water resources, the Secretary shall, in addition to the cessation order, impose affirmative obligations on the operator requiring him to take whatever steps the Secretary deems necessary to abate the imminent danger or the significant environmental harm.

30 U.S.C. § 1271 (1988).

In this case, we address the question whether the Department of the Interior's Office of Surface Mining Reclamation and Enforcement ("OSM"), acting pursuant to its authority under SMCRA, may regulate coal operations that are endangering the public health or safety without effecting a taking of property requiring the payment of just compensation under the Fifth Amendment. A complete statement of the undisputed facts is reported in the opinion of the Court of Federal Claims. To the extent necessary, we repeat those facts below.

Between 1904 and 1920, owners of approximately seven hundred acres of land in the mountainous region of Lincoln District, Marion County, West Virginia, sold to various coal companies for valuable consideration the right to mine the Pittsburgh seam of coal beneath the surface of their property. The owners sold these rights through various mineral severance deeds, some of which included the right to mine "without being liable for any injury or damage done to the overlying surface, or to anything therein or thereon."

By 1966, the Consolidated Coal Company, Inc. ("Consolidated") had acquired all the rights to mine the Pittsburgh seam from these coal companies. Consolidated mined fifty to sixty percent of the Pittsburgh seam coal using a technique known as "room-and-pillar" mining, whereby pillars of coal were left standing to support the surface above the mine. Subsequently, Pittsburgh Coal Works, Inc. ("PCW") acquired the right to mine the coal and pillars left by Consolidated.

In July 1981, the Monongah Development Company acquired from PCW the right to extract the coal that the earlier operators had left in place to support the roof of a mine known as the "Monongah mine." Two independent businessmen, Charles Sorbello and John Markovich, estimated that, by using newly developed mining techniques, they could remove approximately 75,000 to 100,000 tons of coal per year between 1985 and 1989 from the Monongah mine. In making their estimate, they assumed that they could subside[1] the surface above the mine on the properties for which the original owners had conveyed that right. For those surfaces required to be protected by existing state law, they planned to leave coal pillars in place having a 15–degree angle of draw in order to

---

1. "Subsidence" is the lowering of strata overlying a coal mine, including the land surface, caused by the extraction of underground coal.

support the surface.[2] Sorbello then purchased all the corporate stock of the Monongah Development Company. In late 1985, Sorbello and Markovich formed the M & J Coal Company for the purposes of mining and selling the coal. M & J Coal invested approximately $500,000, based on the expectation of recovering $400,000 per year from its mining and selling operations.

M & J began mining without the permit required by West Virginia law. Although it had applied for a transfer of the permit earlier held by PCW, the transfer did not take effect until March 28, 1986. M & J planned to adopt PCW's subsidence control plan, which called for a 15–degree angle of draw under the structures required to be protected by state law. However, M & J did not submit its plan to the state of West Virginia until April 14, 1986 and the state did not approve the plan until April 25, 1986.

In March 1986, two neighboring residents complained to the West Virginia Department of Energy (WVDOE) that M & J's mining operations had damaged their properties. Following a joint investigation by state and federal inspectors, the state issued a Notice of Violation (NOV) against M & J for mining without a permit and without notifying all affected surface owners of the mining and the possibility of subsidence.[3]

One resident contacted OSM to complain of the subsidence and described extensive damage to his property. The resident reported that the needle on his gas meter was "spinning wildly," that a section of the gas line adjacent to the gas meter had been severed, and that his water line to the public water supply was broken. In addition, the electric wires leading to his house were stretched "as tight as a fiddle string." The resident expressed concern about the possibility of a gas explosion and its effects on the safety of his family and neighbors. Mining operations had caused large cracks to develop in the surface of his property and a neighbor's dog had fallen into a crack to its death. The resident believed that neighborhood children were at risk of similar harm.

OSM officials visited the scene and consulted with the WVDOE, which replied that M & J was in compliance with all applicable state statutes, rules, and regulations, and that the state would not take any enforcement action against M & J. Nevertheless, OSM believed that the public was at risk of injury from large cracks in the ground, collapsing structures, and breaks in gas, water, and electrical lines. Thus, exercising its authority under SMCRA, OSM issued a cessation order against M & J "for a condition, practice, or violation creating an imminent danger to the health and safety of the public." The order required that M & J protect the public from surface cracks, restore the subsided land's pre-subsidence capacity to support structures and previous uses, and mine pursuant to a revised subsidence control plan. OSM approved a plan requiring a greater angle of draw under the protected structures and protection of single family dwellings.

M & J sought administrative review of OSM's order. *See* 30 U.S.C. § 1275(a)(1) (1988). In June 1988, the Department of the Interior's Office of Hearings and Appeals (OHA) upheld OSM's action as a valid exercise of its authority pursuant to SMCRA on the ground that M & J's mining activities had created an imminent danger to the health or safety of the public. The OHA noted that OSM would have been "grossly remiss" in its enforcement role had it not ordered cessation

---

**2.** A 15–degree angle of draw requires that a mining company leave a cone-like pillar of coal delineated by dropping a line from the roof of the mine 15 feet away from the structure on all sides, and then extending the bottom of that line to the floor of the mine at a 15–degree angle from the vertical. A larger angle of draw means that more coal must be left in place.

**3.** M & J had relied on notifications that PCW had given surface owners in 1983 and 1984. The notifications contained the following language:

> We anticipate to mine under your property ... in a period of six (6) months from date, and continuing mining activities under your property until completion of mine.
>
> Pittsburgh Coal Works, Inc. shall take such measures to prevent or control adverse surface effects, as shall be required by law and the mining rights granted by the former owners of your property.
>
> The mining rights on your property may permit subsidence and surface effects.

of M & J's mining operations. *M & J Coal Co. v. OSM*, Docket No. CH 6–15–R (1988).

M & J appealed to the Department of the Interior's appellate tribunal, the Interior Board of Land Appeals (IBLA), which ·affirmed the OHA. The IBLA rejected M & J's claim that its mining had not caused the subsidence and found that the subsidence "present[ed] a graphic picture of an imminent danger situation." *M & J Coal Co. v. OSM*, 115 IBLA 8, 23 (1990). M & J did not appeal from the decision of the IBLA.

Despite the new subsidence control plan, M & J's mining operations continued to cause damage in the region. During the next four years, cracks appeared in other residents' properties, the town of Worthington's water tank subsided, and a section of Route 218[4] subsided. The damage necessitated the excavation of a gas line and the repair of electric lines adjacent to Route 218. Worthington's mayor later testified at trial that she and an independent engineering consultant were concerned that the damage would impair the town water tank's stability. The mayor testified that loss of the water tank "would be a dangerous situation because it would discontinue water service for general and emergency purposes, including fire fighting and health exigencies." The government adduced testimony, unrebutted by M & J, that this damage was caused by M & J's mining.

After completing its mining operations, M & J filed suit in the Court of Federal Claims alleging that OSM's enforcement action, which had required M & J to increase the draw angle under protected structures and to protect single family dwellings, deprived it of 99,700 tons of coal it otherwise could have mined, resulting in $580,000.00 in lost profits.[5] The parties stipulated to the material facts and cross-moved for summary judgment.

The court determined that M & J's takings claim depended upon whether it could establish a cognizable property right to mine pursuant to a 15–degree subsidence control plan and a right to subside private dwellings. The court denied M & J's claim because M & J failed to establish that it possessed either of those rights. The court ruled that M & J's reasonable expectations concerning its rights were limited by SMCRA's pre-existing prohibition on mining practices that endanger the public health and safety and that the validity of OSM's actions had been conclusively determined by the prior administrative proceedings, which M & J had failed to challenge. M & J now appeals.

## DISCUSSION

■ Whether the Court of Federal Claims properly granted summary judgment is "a question of law subject to complete and independent review" by this court. *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 799 (Fed. Cir.1993) (citation omitted). Thus, we review the record *de novo* to determine whether any genuine issue of material fact exists, and if not, whether the movant is entitled to judgment as a matter of law. *Id.*; Fed.R.Civ.P. 56(c). The parties do not disagree on any issue of material fact in this case and we conclude that the court did not err in ruling that the government was entitled to judgment as a matter of law.

Invoking this court's recent decision in *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed.Cir.1994),[6] M & J argues that it had acquired, by means of a state permit, the right to mine pursuant to its 15–degree plan and, under state property law, the right

---

4. Route 218 was used regularly by commuters, businesses, school buses and state and municipal workers, including police, firefighters, and emergency workers. On average, 4,500 vehicles traveled on Route 218 each day.

5. On appeal, M & J claims that the lost coal amounted to 100,700 tons, entitling it to an estimated foregone profit of $625,119.00 and $380,-380.62 in interest. From late 1985 to early 1990, M & J mined more than 270,000 tons of coal from the Monongah mine and, despite having to

repair some of the damage it caused, M & J ultimately profited from its mining operations to the extent of $692,086.41.

6. In *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed.Cir.1994), we examined the effect of the Supreme Court's decision in *Lucas v. South Carolina Coastal Council*, —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), on a case decided by the Court of Federal Claims before that opinion issued. 28 F.3d at 1173.

to subside the private dwellings of owners whose predecessors in title had conveyed away that right. Thus, M & J alleges, OSM's requirement that M & J revise its coal mining operations constituted a taking of two categories of coal deposits: (1) deposits under protected surfaces required to be left in place because of the change to a greater than 15–degree angle of draw, and (2) coal under occupied structures that M & J claims it had the right to subside without limitation or liability. We do not agree.

■ The Fifth Amendment's guarantee "nor shall private property be taken for public use, without just compensation" is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). However, property use may be regulated without a compensable taking occurring. *See Pennsylvania Coal v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922) ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). Where to draw the line is not always an easy task, but the Supreme Court has stated that if regulation goes "too far" it will constitute a compensable taking. *Id.* at 415, 43 S.Ct. at 160. Whether the regulation of property entitling a property owner to compensation has occurred depends upon the particular circumstances of the case. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). To determine whether a governmental regulation of property has gone so far as to effect a taking, courts have engaged in an "essentially *ad hoc,* factual inquir[y considering such factors as the] economic impact of the regulation on the claimant[,] the extent to which the regulation has interfered with distinct investment-backed expectations[, and] the character of the governmental action." *Id.; Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984).

■ In *Lucas v. South Carolina Coastal Council,* ―― U.S. ――, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Supreme Court explained that the Takings Clause does not require compensation when an owner is barred from putting land to a use that is proscribed by " 'existing rules or understandings that stem from an independent source such as state law' [which] define the range of interests that qualify for protection as 'property' under the Fifth (and Fourteenth) amendments." *Lucas,* ―― U.S. at ――, 112 S.Ct. at 2901. Such rules and understandings may also stem from federal law. *See id.* ―― U.S. at ――, 112 S.Ct. at 2900 (citing *Scranton v. Wheeler,* 179 U.S. 141, 163, 21 S.Ct. 48, 57, 45 L.Ed. 126 (1900) (interests of riparian owner in the submerged lands bordering on a public navigable water held subject to government's navigational servitude)). Thus, even when a governmental land use regulation deprives a claimant of all economically beneficial use of his property, the government may avoid compensation if "the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Lucas,* ―― U.S. at ――, 112 S.Ct. at 2899; *cf. Penn Central,* 438 U.S. at 124–25, 98 S.Ct. at 2659–60 ("[T]he Court has dismissed 'taking' challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes.") (listing cases).

■ While *Lucas* involved an alleged "total taking," one in which the land owner was deprived of "all economically beneficial use" of his land, which is not true in the present case, the *Lucas* formulation is useful for analyzing takings claims involving land use restrictions even when deprivation is not complete. Specifically, in analyzing a governmental action that allegedly interferes with an owner's land use, there can be no compensable interference if such land use was not permitted at the time the owner took title to the property.

■ Thus, we agree with the Court of Federal Claims that precedent indicates a "two-tiered" approach in analyzing a takings

claim involving governmental action that results in land use restriction. First, a court should inquire into the nature of the land owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with, *i.e.,* whether the land use interest was a "stick in the bundle of property rights" acquired by the owner. *Lucas,* —— U.S. at ——, 112 S.Ct. at 2899. Second, if the claimant can establish the existence of such an interest, the court must then determine whether the governmental action at issue constituted a compensable taking of that "stick." In making the second determination, the court must consider such factors as the character of the governmental action, the economic impact of the action on the claimant, and the extent to which the action has interfered with the claimant's distinct investment-backed expectations. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. Accordingly, before examining the extent of M & J's alleged property deprivation, the content of, and the government's power over, the "bundle of rights" acquired by M & J must be examined to determine whether the proscribed use was part of M & J's "property" within the meaning of the Fifth Amendment. In this case, M & J never acquired the right to mine in such a way as to endanger the public health and safety, and we need not make the second determination.

■ M & J's acquisition of rights by deed did not give it the right to mine in such a way as to endanger the public health and safety. Substantial precedent supports this conclusion. In a similar case involving state regulations requiring coal miners, *inter alia,* to leave 50% of the coal beneath dwellings in place as a means of providing surface support, the Supreme Court stated: "Long ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' ... and the Takings Clause did not transform that principle to one that requires compensation whenever the [government] asserts its power to enforce it." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 491–92, 107 S.Ct. 1232, 1245, 94 L.Ed.2d 472 (1987) (citations omitted). The Court noted that, "since no individual has a right to use his property so as to create a nuisance or otherwise harm others, the [government] has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity." *Id.* at 491 n. 20, 107 S.Ct. at 1245 n. 20; *see also Lucas,* —— U.S. at ——, 112 S.Ct. at 2897 (where health, safety, or general welfare would be promoted by prohibiting particular contemplated uses of land, compensation need not accompany prohibition) (quoting *Penn Central,* 438 U.S. at 125, 98 S.Ct. at 2659–60). Thus, in accordance with settled precedent, M & J could not have acquired under its deed of title the right to cause damage or a substantial risk of damage to the public health or safety.

The fact that M & J had a state permit to mine is also not controlling. The Secretary of the Interior possesses the right to issue federal cessation orders in cases of imminent danger to the health or safety of the public. *See* 30 U.S.C. § 1271. Thus, at the time M & J acquired its mining rights, whatever they were, it knew or should have known that it could not mine in such a way as to endanger public health or safety and that any state authorization it may have received was subordinate to the national standards that were established by SMCRA and enforced by OSM.

■ It is incontestable that OSM's actions were legitimate exercises under SMCRA to prevent harm to the public health and safety. The IBLA determined as much, specifically finding that OSM's actions were necessary to protect the public health and safety and that M & J's operations were posing a threat, not only to particular residents, but to the public in general. M & J chose not to appeal the IBLA's determination. The Court of Federal Claims noted that M & J had chosen not to challenge the validity of OSM's enforcement actions by way of a district court action, *see* 5 U.S.C. § 702. Neither the Court of Federal Claims nor this court may entertain a collateral challenge to the validity of OSM's actions. *See Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 898–99 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

M & J further argues that *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), mandates a holding in its favor. In *Mahon*, an owner of land containing coal deposits deeded away the surface of the land, while reserving the right to mine coal beneath the surface. According to the deed, the grantees waived any claim to damages that might arise from the mining, which waiver was valid under state law. A later-enacted state statute prohibited mining in such a way as to cause subsidence of dwellings.

The *Mahon* Court determined that the statutory prohibition against mining went "too far" because it completely diminished the value of the property and because the damage sought to be prevented by the statute was that to a single private house, which was not "common or public" and was "not justified as a protection of personal safety." 260 U.S. at 413–14, 43 S.Ct. at 159. *Cf. Keystone*, 480 U.S. at 485, 107 S.Ct. at 1242 (state regulation requiring 50% of coal pillar to remain in place under dwellings did not constitute a taking; state had acted to "arrest what it perceive[d] to be a significant threat to the common welfare").

 Relying upon *Mahon*, M & J alleges that OSM used SMCRA as a pretext to impermissibly assist two specific residents, who allegedly possessed no rights to surface support, at the expense of M & J.[7] Unlike *Mahon*, however, the present case does not involve merely a balancing of the private interests of surface owners against the private economic interest of a coal company. *Cf. Keystone*, 480 U.S. at 485, 107 S.Ct. at 1242. It involves the much broader interests of public health and safety. That certain individuals or their predecessors may have unwisely deeded away their rights to surface support cannot estop OSM from exercising its authority to abate an imminent danger to the public health or safety. *See id.* at 488, 107 S.Ct. at 1243. Nor may a state mining permit compromise the right of the federal

government under SMCRA to ensure that the public is free from imminent danger from mining. Despite M & J's focus on the fact that OSM's actions may have benefited individual residents, OSM's actions were taken to insure that M & J's use of its property did not injure the community at large. Justice and fairness do not require that the community at large bear the "burden" of M & J's inability to mine in a manner that is safe to the public. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659; *Mugler v. Kansas*, 123 U.S. 623, 668–69, 8 S.Ct. 273, 300–01, 31 L.Ed. 205 (1887) ("The power ... of prohibiting such use by individuals of their property as will be prejudicial to [health or safety] is not ... burdened with the condition that the [government] must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community.").

An "antecedent" inquiry into the property use interests acquired by M & J thus reveals that M & J never acquired the right to mine in such a way as to endanger the public health and safety. OSM's action to prevent M & J from doing so did not interfere with M & J's property use interests.

## CONCLUSION

Because M & J failed to establish that OSM's actions effected a taking of private property for purposes of the Fifth Amendment, the Court of Federal Claims' grant of the government's motion for summary judgment is

*AFFIRMED.*

---

7. The two residents who had complained in March 1986 obtained no unique benefit by OSM's actions, however, as M & J had already completed its mining operations near their homes. OSM did not require M & J to compensate those residents or to repair their homes.